# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:20CR **109** |
| v. | 18 U.S.C. § 1343<br>Wire Fraud |
| GORDON G. MILLER, III, | (Counts 1-4) |
| *Defendant.* | 18 U.S.C. § 1341<br>Mail Fraud<br>(Counts 5-6) |
| | 18 U.S.C. § 1957<br>Engaging in an Unlawful<br>Monetary Transaction<br>(Count 7) |
| | 18 U.S.C. § 1512(b)(1)<br>Witness Tampering<br>(Count 8) |
| | Forfeiture Allegation |

## INDICTMENT
October 2020 Term – Richmond, Virginia

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times material to this indictment, unless otherwise stated:

1. Defendant GORDON G. MILLER, III was the sole owner and operator of G3 Systems, Inc., an interface design and software engineering company, and G3i Ventures, LLC, purportedly a venture capital company, both based in Glen Allen, Virginia.

2. MILLER was also associated with Company 1, an e-learning company based in Iowa, until in or about 2019.

3. In or about 2017, MILLER, through G3 Systems and Company 1, received final payments for work performed on several multi-year federal contracts. Around this time,

MILLER began to engage in overlapping schemes to defraud to prevent his companies from going out of business and to maintain his lifestyle in the absence of legitimate income.

## I. Investment Fraud Scheme

4. Beginning in or about November 2016, MILLER joined Quora.com, a question-and-answer forum on which MILLER represented himself as an entrepreneur with a significant net worth, multiple advanced degrees, and expertise in investing in technology companies.

5. For example, the "Credentials & Highlights" section of MILLER's Quora profile stated that he graduated in 1996 with a "PhD Human-Computer Interaction & Computer Science, Virginia Tech." In fact, MILLER never obtained any doctoral degree from Virginia Polytechnic Institute and State University (Virginia Tech).

6. In or about February 2017, MILLER began soliciting contacts made on Quora to participate in a "private debt instrument program" offered through his company, G3iVentures, LLC. When individuals reached out to MILLER directly to inquire about the "private debt instrument program," MILLER made and caused to be made material misrepresentations and omissions to induce these individuals to give him money. The specific misrepresentations MILLER made to individuals varied, but included the following statements and/or omissions:

   a. MILLER represented that the individual's money would be used to expand various "cash flow producing companies" in his "portfolio that are producing a great[er] than 25% internal rate of return";

   b. MILLER guaranteed individuals an annual rate of return of approximately 18 percent;

   c. MILLER represented that "increased revenue and profits" from his companies would fund monthly interest and principal payments to the individuals;

   d. MILLER did not inform individuals that, in fact, he would pay them promised monthly interest and principal payments with the money he collected from his "private debt instrument program";

2

  e.  MILLER represented that the individual's money would be secured by the value of his positions in all G3i Ventures' companies; and

  f.  MILLER did not inform individuals that he would use their money for purposes other than expanding his "cash flow producing companies", including to pay substantial company and personal debt, and to pay his own living expenses.

7. Between in or about February 2017, through in or about July 2018, MILLER solicited money from at least 9 individuals. MILLER memorialized his arrangements with these individuals in promissory notes.

8. MILLER initially made interest and principal payments to these individuals. However, in or about March 2018, MILLER sent an email to these individuals offering to increase the rate of return he owed on each "investment" to 50 percent. In exchange, MILLER asked that the individuals agree to "reinvest" their monthly interest and principal payments in a new project. In fact, MILLER knew that there was no money to "reinvest" because none of the money he collected had generated any revenue and profits, but instead had been used for other purposes.

9. Based on these misrepresentations, among others, most individuals agreed to these changes, and signed new promissory notes reflecting the revised terms, and a maturity date of July 1, 2019.

10. On the maturity date of the revised promissory notes, MILLER did not repay individuals their principal and interest as promised.

## II. Federal Program Fraud Scheme

11. In or about 2018, MILLER was also involved in securing a subcontract working for Company 2, a Montreal-based prime contractor for the United States federal government, that was bidding on a one-year preliminary contract for the United States Army to work on the Army

Training Information System (ATIS). Initially, MILLER participated in securing this subcontract through Company 1.

12. In a resume submitted to Company 2, MILLER listed two Ph.D. degrees from Virginia Tech: "Ph.D. Computer Science, Human Factors, 1995" and "Ph.D. Industrial Engineering, Human Factors, 1994." Company 2 relied on this information to award the subcontract for work on the ATIS contract. However, as discussed above, MILLER never obtained any doctoral degree from Virginia Tech.

13. On or about July 25, 2018, MILLER sent an email to the owner of Company 1 which read in part:

> As of Tuesday, G3 Systems, Inc. and G3iVentures LLC will both close for good. The loss of our [federal] contract revenue back in August 2017 left us a hurdle that we are unable to get over. I have no other sources of income at this point except this contract from [Company 2] to [Company 1]. I am going to work the position myself. What We [sic] have done projects before a only a minimal load. We have $13,952 coming in from the [Company 2] effort. I would need healthcare for my me [sic] family and $9,000 of that per month if possible. I have no other options at this point.

14. The next day, on or about July 26, 2018, MILLER informed Company 2 that the subcontracted work on the ATIS project would be completed by G3 Systems, not Company 1.

15. The owner of Company 1 did not learn that MILLER successfully diverted the ATIS subcontract to G3 Systems until approximately two months later, on or about September 26, 2018. When the owner of Company 1 confronted MILLER about the change, MILLER claimed the final subcontract award would cover only two G3 Systems employees and that MILLER himself would have to work "for free" on the subcontract.

16. The subcontract agreement with Company 2 required MILLER to submit monthly invoices for time and materials spent on the work. Between in or about August 2018, and in or about May 2019, MILLER submitted signed time sheets and invoices accounting for the work of

4

four G3 Systems employees – including himself – totaling over $300,000 in billings. Company 2 paid those invoices in full.

17. In fact, two of the employees MILLER listed on the G3 Systems' invoices resigned from the company by the end of November 2018 after having performed little to no work on the ATIS contract. Additionally, the third individual listed as a G3 Systems employee, whom MILLER identified on invoices as a "Programmer," performed no work on the ATIS contract except to log on to a computer portal each day and dial in to conference calls without ever participating. In truth, the "Programmer" had no professional background or training in computer programming and instead worked part-time at a check-cashing store where MILLER cashed Company 2's checks to G3 Systems for the work purportedly performed on the ATIS project.

### III. Money Laundering Activities

18. On or about July 20, 2017, MILLER retained an accounting firm to provide tax compliance services, including the preparation and filing of federal and Virginia business and personal tax returns for 2011 through 2017.

19. On or about May 28, 2018, the Internal Revenue Service (IRS) sent MILLER a Notice of the IRS's intent to seize MILLER's property or rights to property due to unpaid taxes. In correspondence with his accountant, MILLER relayed that the IRS conveyed that he owed more than $300,000 in unpaid federal taxes.

20. Similarly, on or about July 26, 2018, MILLER emailed his accountant to inform him that Virginia seized "all our revenue" and "put a lien on everything" due to unpaid Virginia taxes. When MILLER asked the accountant whether Virginia would "impound the money in my accounts," the accountant responded, "Yes – they will try with any account numbers that they have."

5

21. In or about August 2018, MILLER received an email from his accounting firm that the firm had been able to negotiate with the IRS for an unpaid balance amount of approximately $157,000. The email to MILLER indicated that the IRS "will file liens until this is paid but will not levy accounts if we can propose a reasonable plan of action."

22. In or about October and November 2018, MILLER told at least one individual who gave him money pursuant to the "private debt instrument program" that MILLER could not make the monthly interest and principal payments he owed the individual because the "Virginia Department of Taxation" had "frozen" his accounts.

23. On or about November 26, 2018, MILLER informed his accountant via email, "If the IRS piles on we are done and nobody gets paid if they put us completely out of business."

24. From fall 2018 through early summer 2019, MILLER took the checks he received from Company 2 to a check-cashing store in Richmond, Virginia, and typically exchanged them for cash.

25. On or about October 16, 2019, the Internal Revenue Service filed a Notice of Federal Tax Lien in the names of MILLER and his wife. According to the Lien, MILLER owed unpaid balances for individual income taxes for 2012, 2013, and 2016, with the total amount due of $156,377.86.

## COUNTS ONE THROUGH FOUR
(Wire Fraud)

26. The allegations contained in paragraphs 1 through 10, and 18 through 25 of this indictment are realleged and incorporated as though set forth in full here.

27. On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant, GORDON G. MILLER, III, knowingly caused to be transmitted by means of wire communication in interstate commerce, the writings, signs, signals, pictures, and sounds described below, each transmission constituting a separate count of this indictment:

| Count | Date of Wire | Wire Communication |
| --- | --- | --- |
| 1 | June 20, 2017 | Wire communication from a location outside the Commonwealth of Virginia to cause the transfer of $100,000 from N.P. to an Union Bank & Trust account ending in 5564 |
| 2 | September 15, 2017 | Wire communication from a location outside the Commonwealth of Virginia to cause the transfer of $50,000 from V.V. to a Bank of America account in the name of G3iVentures ending in 5469 |
| 3 | September 19, 2017 | Wire communication from a location outside the Commonwealth of Virginia to cause the transfer of $50,000 from B.H. to a Bank of America account in the name of G3iVentures ending in 5469 |
| 4 | September 25, 2017 | Wire communication from a location outside the Commonwealth of Virginia to cause the transfer of $100,000 from F.D. to a Bank of America account in the name of G3iVentures ending in 5469 |

(In violation of Title 18, United States Code, Sections 1343.)

## COUNTS FIVE THROUGH SIX
(Mail Fraud)

28. The allegations contained in paragraphs 1 through 3, and 11 through 25 of this indictment are realleged and incorporated as though set forth in full here.

29. On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant, GORDON G. MILLER, III, knowingly caused to be delivered by mail and any private and commercial interstate carrier the following items, each mailing constituting a separate count of this indictment:

| Count | Date of Mailing | Item Mailed |
|---|---|---|
| 5 | May 28, 2019 | A mailing from Charleston, South Carolina to a mailbox in Glen Allen, Virginia containing a $49,008.96 check made payable to G3 Systems, Inc. |
| 6 | June 25, 2019 | A mailing from Charleston, South Carolina to a mailbox in Glen Allen, Virginia containing a $46,383.76 check made payable to G3 Systems, Inc. |

(In violation of Title 18, United States Code, Sections 1341 and 2.)

## COUNT SEVEN
(Engaging in an Unlawful Monetary Transaction)

30. The allegations contained in paragraphs 1 through 25 of this indictment are realleged and incorporated as though set forth in full here.

31. On or about May 31, 2019, in the Eastern District of Virginia, the defendant, GORDON G. MILLER, III, knowingly engaged and attempted to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the defendant exchanged a check made payable to G3 Systems, Inc. in the amount of $49,008.96 for U.S. currency in the amount of $47,292.66, such property having been derived from a specified unlawful activity, to wit: mail fraud, in violation of Title 18, United States Code, Section 1341.

(In violation of Title 18, United States Code, Sections 1957.)

## COUNT EIGHT
(Witness Tampering)

32. The allegations contained in paragraphs 1 through 25 of this indictment are realleged and incorporated as though set forth in full here.

33. On or about June 17, through on or about July 8, 2020, in the Eastern District of Virginia and elsewhere, the defendant, GORDON G. MILLER, III, knowingly and intentionally corruptly persuaded and attempted to corruptly persuade and engage in misleading conduct toward another person, to wit, Individual 1, with the intent to influence, delay, and prevent the testimony of any person in an official proceeding.

(In violation of Title 18, United States Code, Sections 1512(b)(1)).

## FORFEITURE ALLEGATION

Pursuant to 32.2 of the Federal Rules of Criminal Procedure as to Counts One through Six of this Indictment, the defendant, upon conviction of any of the offenses, shall forfeit to the United States any property, real or personal, which constitutes, or is derived from, proceeds traceable to the offense, pursuant to 18 U.S.C. § 982(a)(1)(C) and 28 U.S.C. § 2461(c).

The defendant is further advised that if convicted of Count Seven of this Indictment, he shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to the offense, pursuant to 18 U.S.C. § 982(a)(1).

The property subject to forfeiture includes but is not limited to the following:

A sum of money of at least $1.3 million, which represents the total proceeds of the above-described schemes and executions of which are charged in Counts One through Six of this Indictment, which sum shall be reduced to a money judgment against the defendant in favor of the United States.

If the property subject to forfeiture meets the requirements of 21 U.S.C. § 853(p), the government will seek an order forfeiting substitute assets.

(All in accordance with Title 18, United States Code, Sections 982(a)(1) and 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c).)

A TRUE BILL:

FOREPERSON

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

**Pursuant to the E-Government Act, the original of this page is filed UNDER SEAL in the Clerk's Office.**

By: _Katherine Lee Martin_
Katherine Lee Martin
Kevin S. Elliker
Assistant United States Attorneys

11