IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GORDON G. MILLER, III,<br><br>*Defendant*. | Case No. 3:20CR109 |

**STATEMENT OF FACTS**

The parties stipulate that the allegations contained in the Criminal Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt.

1. Defendant GORDON G. MILLER, III was the sole owner and operator of G3 Systems, Inc., an interface design and software engineering company, and G3i Ventures, LLC, purportedly a venture capital company, both based in Glen Allen, Virginia.

2. MILLER was also associated with Company 1, an e-learning company based in Iowa, until in or about 2019.

3. In or about 2017, MILLER, through G3 Systems and Company 1, received final payments for work performed on several multi-year federal contracts. Around this time, MILLER began to engage in overlapping schemes to defraud to prevent his companies from going out of business and to maintain his lifestyle in the absence of legitimate income.

**I.   Count One: Wire Fraud**

4. Between in or about 2017 through in or about September 2020, in the Eastern

District of Virginia and elsewhere, the defendant, GORDON G. MILLER, III, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme did knowingly transmit and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures and sounds.

5. That is, beginning in or about November 2016, MILLER joined Quora.com, a question-and-answer forum on which MILLER represented himself as an entrepreneur with a significant net worth, multiple advanced degrees, and expertise in investing in technology companies.

6. For example, the "Credentials & Highlights" section of MILLER's Quora profile stated that he graduated in 1996 with a "PhD Human-Computer Interaction & Computer Science, Virginia Tech." In fact, MILLER never obtained any doctoral degree from Virginia Polytechnic Institute and State University (Virginia Tech).

7. In or about February 2017, MILLER began soliciting contacts made on Quora to participate in a "private debt instrument program" offered through his company, G3iVentures, LLC. When individuals reached out to MILLER directly to inquire about the "private debt instrument program," MILLER made and caused to be made material misrepresentations and omissions to induce these individuals to give him money. The specific misrepresentations MILLER made to individuals varied, but included the following statements and/or omissions:

    a. MILLER represented that the individual's money would be used to expand various "cash flow producing companies" in his "portfolio that are producing a great[er] than 25% internal rate of return";

    b. MILLER guaranteed individuals an annual rate of return of approximately 18 percent;

2

    c.    MILLER represented that "increased revenue and profits" from his companies would fund monthly interest and principal payments to the individuals;

    d.    MILLER did not inform individuals that, in fact, he would pay them promised monthly interest and principal payments with the money he collected from his "private debt instrument program";

    e.    MILLER represented that the individual's money would be secured by the value of his positions in all G3i Ventures' companies; and

    f.    MILLER did not inform individuals that he would use their money for purposes other than expanding his "cash flow producing companies", including to pay substantial company and personal debt, and to pay his own living expenses.

8.    Between in or about February 2017, through in or about July 2018, MILLER solicited money from at least 10 individuals, who transferred their money to MILLER via wire transmissions. For example, on or about June 20, 2017, N.P. sent a $100,000 via wire transmission from outside the Commonwealth of Virginia to a Union Bank & Trust account, controlled by MILLER and located within the Eastern District of Virginia.

9.    MILLER memorialized his arrangements with these individuals in promissory notes.

10.    MILLER initially made interest and principal payments to these individuals. However, in or about March 2018, MILLER sent an email to these individuals offering to increase the rate of return he owed on each "investment" to 50 percent. In exchange, MILLER asked that the individuals agree to "reinvest" their monthly interest and principal payments in a new project. In fact, MILLER knew that there was no money to "reinvest" because none of the money he collected had generated any revenue and profits, but instead had been used for other purposes.

11. Based on these misrepresentations, among others, most individuals agreed to these changes, and signed new promissory notes reflecting the revised terms, and a maturity date of July 1, 2019.

12. On the maturity date of the revised promissory notes, MILLER did not repay these individuals their principal and interest as promised. Instead, MILLER sent another email to these individuals which stated he would not be able to pay the promised amount due to a delay in the project referred to in his March 2018 email, and he proposed a further extension of the maturity date of the promissory notes with promises of additional interest and penalties. In the email, MILLER cautioned the individuals against "taking hasty legal action that would jeopardize repayment for everyone ... and public negative comments about this since that will also serve to undermine our progress moving forward."

13. On or about June 17, 2020, E.K., one of the individuals who provided MILLER money pursuant to the above described "private debt instrument program", sent MILLER a text message notifying him that he received a grand jury subpoena, and asking for updates related to the repayment of his money. MILLER responded, in part:

> A majority of the money from your group went to the [] project and you even suggested one time having it focus on that and we did. It's absurd. They are now disrupting other deals we have worth over $1.5M that would repay everyone. We have deals that we're closing in March that we're delayed due to COVID and now the FBI interference is disrupting my ability to execute. All this b**s*** is because 2 of the 10 people were not happy with the delays and 1 of the 2 called the FBI knowing that there was no fraud. If not for the FBI interference in August 2019 everyone would have been paid out by now. Despite all this we have confined to work on [] [project]. We have hour logs for all hours we have worked on all projects that justify the money we received....
>
> Until the COVID lockdown is done and international travel is allowed then nothing will get closed. The FBI wants to get an indictment so that they can seize my passport and prevent me from traveling and closing the deals. It's all b**s***. Just tell the truth and it will be all good. I'm not afraid of the truth. Nobody predicted COVID-19. My Singapore deal on March3-4 was positive and

4

> I was supposed to go to LA the next week and Singapore in early April. If everything had remained open it would have closed. Since one of my proposed charges is "witness tampering", I will wish you all the best in your appearance. I'm not trying to sway your opinion only trying to provide some much needed context. Simply tell the truth as you know it and it will all unfold as it is supposed to.

14. In fact, MILLER did not use the majority of E.K.'s money on the particular project he suggested in his text message; instead, he spent the majority of E.K.'s money on personal purposes, including paying his own living expenses. And neither the FBI nor the pandemic prevented MILLER from repaying the money he owed these individuals.

## II. Count Two: Money Laundering

15. In or about 2018, MILLER was also involved in securing a subcontract working for Company 2, a Montreal-based prime contractor for the United States federal government, that was bidding on a one-year preliminary contract for the United States Army to work on the Army Training Information System (ATIS). Initially, MILLER participated in securing this subcontract through Company 1.

16. In a resume submitted to Company 2, MILLER listed two Ph.D. degrees from Virginia Tech: "Ph.D. Computer Science, Human Factors, 1995" and "Ph.D. Industrial Engineering, Human Factors, 1994." Company 2 relied on this information to award the subcontract for work on the ATIS contract. However, as discussed above, MILLER never obtained any doctoral degree from Virginia Tech.

17. On or about July 25, 2018, MILLER sent an email to the owner of Company 1 which read in part:

> As of Tuesday, G3 Systems, Inc. and G3iVentures LLC will both close for good. The loss of our [federal] contract revenue back in August 2017 left us a hurdle that we are unable to get over. I have no other sources of income at this point except this contract from [Company 2] to [Company 1]. I am going to work the position myself. What We [sic] have done projects before a only a minimal load. We have $13,952 coming in from

5

the [Company 2] effort. I would need healthcare for my me [sic] family and $9,000 of that per month if possible. I have no other options at this point.

18. The next day, on or about July 26, 2018, MILLER informed Company 2 that the subcontracted work on the ATIS project would be completed by G3 Systems, not Company 1.

19. The owner of Company 1 did not learn that MILLER successfully diverted the ATIS subcontract to G3 Systems until approximately two months later, on or about September 26, 2018. When the owner of Company 1 confronted MILLER about the change, MILLER claimed the final subcontract award would cover only two G3 Systems employees and that MILLER himself would have to work "for free" on the subcontract.

20. The subcontract agreement with Company 2 required MILLER to submit monthly invoices for time and materials spent on the work. Between in or about August 2018, and in or about May 2019, MILLER submitted signed time sheets and invoices accounting for the work of four G3 Systems employees – including himself – totaling over $300,000 in billings. Company 2 paid those invoices by checks mailed to defendant in Glen Allen, Virginia.

21. For example, on or about May 28, 2019, Company 2 mailed from Charleston, South Carolina to a mailbox in Glen Allen, Virginia a $49,008.96 check made payable to G3 Systems, Inc. pursuant to an invoice submitted by MILLER to Company 2 in or about April 2019.

22. In fact, two of the employees MILLER listed on the G3 Systems' invoices resigned from the company by the end of November 2018 after having performed little to no work on the ATIS contract. Additionally, the third individual listed as a G3 Systems employee, whom MILLER identified on invoices as a "Programmer," performed no work on the ATIS contract except to log on to a computer portal each day and dial in to conference calls without ever participating. In truth, the "Programmer" had no professional background or training in

6

computer programming and instead worked part-time at a check-cashing store where MILLER cashed Company 2's checks to G3 Systems for the work purportedly performed on the ATIS project.

23. On or about July 20, 2017, MILLER retained an accounting firm to provide tax compliance services, including the preparation and filing of federal and Virginia business and personal tax returns for 2011 through 2017.

24. On or about May 28, 2018, the Internal Revenue Service (IRS) sent MILLER a Notice of the IRS's intent to seize MILLER's property or rights to property due to unpaid taxes. In correspondence with his accountant, MILLER estimated that he owed more than $300,000 in unpaid federal taxes.

25. On or about July 16, 2018, the Commonwealth of Virginia, Department of Taxation, filed a Memorandum of Lien indicating that MILLER owed unpaid balances for individual income taxes for 2011, 2013, 2015, and 2016, with the total amount due of $37,031.32.

26. On or about July 26, 2018, MILLER emailed his accountant to inform him that Virginia seized "all our revenue" and "put a lien on everything" due to unpaid Virginia taxes. When MILLER asked the accountant whether Virginia would "impound the money in my accounts," the accountant responded, "Yes – they will try with any account numbers that they have."

27. In or about August 2018, MILLER received an email from his accounting firm indicating that the IRS "will file liens until this is paid but will not levy accounts if we can propose a reasonable plan of action."

7

28.     On or about November 26, 2018, MILLER informed his accountant via email, "If the IRS piles on we are done and nobody gets paid if they put us completely out of business."

29.     From fall 2018 through early summer 2019, MILLER took the checks he received from Company 2 to a check-cashing store in Richmond, Virginia, and typically exchanged them for cash.

30.     For example, on or about May 31, 2019, in the Eastern District of Virginia, the defendant, GORDON G. MILLER, III, knowingly engaged in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, in that the defendant exchanged a check made payable to G3 Systems, Inc. in the amount of $49,008,96 for U.S. currency in the amount of $47,292.66, such property having been derived from a specified unlawful activity, specifically: mail fraud, in violation of Title 18, United States Code, Section 1341.

31.     On or about October 16, 2019, the Internal Revenue Service filed a Notice of Federal Tax Lien in the names of MILLER and his wife. According to the Lien, MILLER owed unpaid balances for individual income taxes for 2012, 2013, and 2016, with the total amount due of $156,377.86.

### III.    Count Three: Receipt of Child Pornography

32.     Based on the facts gathered regarding the above-described fraud offenses, federal agents obtained a search warrant for MILLER's residence in or about June 2020. That warrant authorized the search of MILLER's residence and seizure of, among other things, electronic devices used as means to commit the fraud offenses. The warrant also authorized the off-site forensic examination of those devices.

8

33. Among the seized electronic devices was a Seagate 1 TB External HDD external hard drive, bearing serial number NAOC7532, found in Miller's second-floor home office. After seizing the electronic devices pursuant to the residence search warrant, law enforcement conducted an initial review on each device known as triaging, which was done in this case to confirm that a forensic extraction of the device would properly capture all the data contained on the device.

34. On or about June 18, 2020, while triaging the external hard drive described above, FBI personnel discovered a folder containing pornographic material. On or about June 19, 2020, FBI agents assigned to the Child Exploitation Task Force reviewed these findings in order to corroborate that various images depicted child sexual abusive material (CSAM). Several images located in a folder named "64 GB" were confirmed to be CSAM.

35. Additionally, during the triaging of the forensic image of MILLER's iPhone 11, agents observed several internet searches including "kid naked at home" and "mother daughter threesome." Agents also observed website history showing access to websites including petiteteenager.com and motherless.com. The latter website is one that is known to law enforcement as a place used by individuals who collect, trade, and distribute child abusive material to conduct their illegal activities.

36. On or about June 19, 2020, based in part on the foregoing information, agents obtained a warrant to search the electronic devices and forensic images seized from MILLER's home for evidence related to child pornography.

37. On or about September 10, 2020, agents arrested MILLER and conducted a second premises search at his residence pursuant to a Federal search warrant. During the execution of the search, additional electronic devices were seized.

9

38. After MILLER's arrest, agents continued to review the electronic devices seized in the searches executed at MILLER's residence. The government seized 83 devices from MILLER's residence pursuant to these search warrants. Based on analysis of these devices to date, the government has determined that files constituting CSAM were present on at least 16 devices, and agents have identified more than 700 images or videos constituting child pornography, as defined in Title 18, United States Code, Section 2256(8)(A).

39. That is, between in or about August 9, 2017, and on or about September 10, 2020, in the Eastern District of Virginia, the defendant, GORDON G. MILLER, III, unlawfully and knowingly received and attempted to receive child pornography using any means of facility of interstate or foreign commerce or that had been mailed, or that had been shipped or transported in or affecting interstate or foreign commerce by an means, including by computer, to wit: still image and video files depicting minor and prepubescent children engaging in sexually explicit conduct, including but not limited to oral sex, sexual intercourse, bestiality, masochistic abuse, and the lascivious exhibit of the genitals and public area.

40. For example, agents determined that MILLER had been accessing CSAM files displayed on multiple websites and using the screen-recording feature on his Apple computer to download and save the files. For example, the following video was recorded in this manner and saved to the Seagate 1 TB External HDD external hard drive described above:

    a. A screen recording named "11YO CUM DADDY.mov," was created on Monday, November 20, 2017 at 5:41:36 AM (10:41:36 UTC). The recording was created using the screen recording feature on an Apple computer. The recording began with a desktop display on the computer that included numerous files and documents associated with MILLER, including a file entitled, "Promissory Note John Doe.pdf". The day and time on the screen were "Monday" and "6:40 AM." After the recording began, the user switched the screen to a website video from the website Avgle.com and clicked play. The video depicted a close up of a prepubescent female's vagina being penetrated by an adult erected penis. The video then focused on the child's

body and face. The child appeared unconscious while wearing a dress but no underwear. The video focused on the child's genitalia again while the male retracted his penis after ejaculating inside the child. The male touched the child's vagina with his hand. After the website video ended, the user of the Apple computer moved the cursor and stopped the recording.

41. The actions taken by the defendant, as described above, were taken willfully and knowingly. The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law.

42. The preceding only includes those facts necessary to establish the defendant's guilt as to the offense to which he is entering a guilty plea. It does not necessarily reference all information known to the government or the defendant about the criminal conduct at issue.

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By: *Katherine Lee Martin* (signature)
Katherine Lee Martin
Kevin S. Elliker
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between myself and the United States, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Gordon G. Miller, III
Defendant


I am Gordon G. Miller, III's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
George Townsend, Esquire
Counsel for Defendant