IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| V. | ] | Case No. 3:20-cr-00109-JAG |
| | ] | |
| GORDON G. MILLER, III | ] | |

**DEFENDANT'S POSITION WITH RESPECT TO
SENTENCING FACTORS**

COMES NOW, the defendant, GORDON G. MILLER, III, by counsel, George A.

Townsend, IV, pursuant to Rule 32 of the *Federal Rules of Criminal Procedure,* § 6A1.3

of the *United States Sentencing Guidelines* (hereinafter U.S.S.G.) and § 18 U.S.C.

3553(a) and hereby represents that he has received and reviewed the Presentence Report

(hereinafter PSR) in the above case and has **no objection** to the PSR resulting in a Total

Offense Level Total of 31 and Criminal History Category I with a corresponding

advisory guideline range of 108 – 135 months imprisonment.  (PSR pages 20-23 and 28).

For the following reasons, Mr. Miller's sentence should vary from the advisory

*United States Sentencing Guidelines* range and he should be sentenced to sixty months

imprisonment.  On this same day Defendant's Motion for Variance Sentence was filed.

This Position With Respect to Sentencing Factors outlines the justification and reasoning

in support of the Motion.

I.   Relevant Sentencing Law

In United *States v. Abu Ali*, 528 F.3d 210, 259, 260 (4th Cir. 2008) the Court of

Appeals for the Fourth Circuit summarized the current sentencing framework:

In *United States v. Booker,* 543 U.S. 220, 245, 125 S.Ct. 738, 160,
L.Ed.2d 621 (2005), the Supreme Court rendered the Sentencing Guidelines

1

"effectively advisory." Nevertheless, district courts in the post-Booker landscape must follow specific steps to arrive at an appropriate sentence.

First, the district court must correctly calculate a defendant's sentence under the now-advisory guidelines. *See Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."); *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2465, 168 L.Ed.2d 203 (2007). A sentence based on an improperly calculated guideline range will be found unreasonable and vacated. *See Gall*, 128 S.Ct. at 597 (noting that "improperly calculating" the applicable Guidelines range constitutes a "significant procedural error").

Next, the district court must allow "both parties an opportunity to argue for whatever sentence they deem appropriate." *Gall*, 128 S.Ct. at 596. In light of these arguments, the district court must then "consider all of the § 3553(a) factors," *id.*, keeping in mind the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 128 S.Ct. 558, 570, 169 L.Ed.2d 481 (2007) (quoting 18 U.S.C. § 3553(a)); *see also Gall*, 128 S.Ct. at 596 & n. 6. In so doing, the court "must make an individualized assessment based on the facts presented" and cannot "presume that the Guidelines range is reasonable." *Gall*, 128 S.Ct. at 596-97. If the sentencing court believes "an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 597.

Finally, the district court "must adequately explain the chosen sentence." Id. This "allow[s] for the meaningful appellate review" and "promote[s] the perception of fair sentencing." *Id.* Notably, if the court imposes "an unusually lenient or an unusually harsh sentence," it must provide "sufficient justifications" for its selection. *Id.* at 594; *see also Rita*, 127 S.Ct. at 2468 (stating "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has … a reasoned basis for exercising his own legal decisionmaking authority").

II.  Applying 18 U.S.C. § 3553(a)

Considering all of the relevant factors of 18 U.S.C. § 3553(a), a sentence of sixty months incarceration would be "sufficient, but not greater than necessary" to accomplish the numerous goals of sentencing.

2

**A.**     The first set of factors to be considered to determine an appropriate sentence is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a).

The facts of this case have been detailed in the agreed Statement of Facts and again on pages 6 - 17 of the PSR.

The facts of this case reveal an entirely devastating set of events.  The facts are devastating for all of the victims and devastating for the defendant and his family.

This case involves two separate fraud schemes and simultaneous receipt of child pornography.  The first scheme supports the plea and subsequent finding of guilt for count one of the criminal information which charged wire fraud.  Beginning in 2017, Mr. Miller solicited monetary investments in a "private debt instrument program."  (PSR page 7).  In an effort to solicit the investments, Mr. Miller made several misrepresentations and guaranteed a financial return to each investor.  (PSR page 8).  Each investment was memorialized in a promissory note that was created by Mr. Miller.  (PSR page 8). Initially, Mr. Miller made some interest and principal payments to some of the investors; however, when the promissory notes matured, Mr. Miller allowed the investors to reinvest the funds for a guarantee of an increased return.  (PSR page 8,9).  In all, there were nine victims who invested $1,045,000 with $220,100 returned to the investors. (PSR page 16, para. 22).  In total there was $827,000 invested that was not returned to the victims.  (PSR page 16, para. 22).

The second scheme supports the plea and subsequent finding of guilt for count two of the criminal information which charged money laundering.  In 2018, Mr. Miller worked with Company 1 to secure a subcontract for federal government work with the

prime contractor, Company 2.  (PSR page 10).  After the subcontract was awarded to Company 1, on July 25, 2018, Mr. Miller informed Company 1 that he would perform the work himself.  (PSR page 10).  The following day, Mr. Miller informed Company 2 that the work would be performed by himself (G3 Systems) and not by Company 1.  (PSR page 11).   Company 1 did not learn that the subcontract had been diverted until September of 2018.  (PSR page 11).  In the interim, Company 2 had paid Mr. Miller a total of $300,516.32 in several separate checks.  Mr. Miller subsequently cashed each check at ACE Cash Express.  (PSR page 17, paragraph 25).

During the investigation of the above schemes, law enforcement received and executed a search warrant at Mr. Miller's residence in June of 2020.  (PSR page 13).  As a result of an image found during the search of an electronic device that was seized during the search of Mr. Miller's residence in June 2020, law enforcement obtained another search warrant to search for child pornography on the previously seized devices. (PSR page 13).  In September 2020, law enforcement obtained another search warrant for Mr. Miller's residence to specifically search for child pornography.  (PSR page 13)  In total, the 16 devices seized contained child pornography revealing 11,494 unique Category One files, 33,437 unique Category Two files, and 850 unique Category Three files.  (PSR page 17, paragraph 26)

Prior to the events leading to Mr. Miller's criminal charges, he lived a productive life free of criminal activity.  Mr. Miller was raised in the Richmond area by both of his parents.  During Mr. Miller's early years he witnessed verbal and physical abuse at the hands of his father both toward him and his mother.  At times, his father also abused alcohol.  Mr. Miller's parents divorced when he was 15 years old.  After living with his

4

mother, he returned to live with his farther since his mother relocated to Florida and he wanted to finish his schooling in Virginia.  Fortunately, his father stabilized, decreased his alcohol consumption and began a successful business soon after Mr. Miller returned to live with him.  Mr. Miller completed his high school years in the Richmond area and then attended VCU, where he graduated in 1987.  Mr. Miller continued his education at Virginia Tech where he was awarded a Master's degree in Architecture in 1991.  He continued his education at Virginia Tech by later taking classes toward a Ph.D.

In 1993, Mr. Miller began his business career doing consulting work that was mainly editing and software development.  In 1994, Mr. Miller incorporated his business, G3, and he began to build multimedia platforms and develop computer software.  In 1996 Mr. Miller was awarded his first U.S. Federal Government contract developing multimedia platforms for the U.S. Navy.  Then in 1998, Mr. Miller was awarded a contract with the U.S. Army again developing multimedia platforms.  By this time, his business was successful and he began to employ approximately five employees.  After the U.S. Army contract, Mr. Miller won a contract with the United States Department of State conducting interface design.

Finally, in 2007 Mr. Miller was awarded a contract with the National Institute of Health where his company was providing interface design and software engineering.  At this point his company was having continued success and he employed approximately a dozen people.  Unfortunately, after ten years of contract work with the National Institute of Health, in 2017, the contract was not renewed.  While Mr. Miller did have other sources of income from, mostly, website development and maintenance the National

Institute of Health contract was the lion's share of his income.  The loss of the National

Institute of Health contract in 2017 coincides with the beginning of the criminal offenses.

**B.**      The second set of factors contemplated by 18 U.S.C. § 3553(a) discuss the:

**(2)** the need for the sentence imposed—
>   **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   **(B)** to afford adequate deterrence to criminal conduct;
>   **(C)** to protect the public from further crimes of the defendant; and
>   **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

### 1.  "just punishment"

A sentence of sixty months incarceration would sufficiently accomplish these

goals.  A sentence of sixty months, reflects the serious nature of all three counts of

conviction, promotes respect for the law and provides just punishment.

On September 9, 2020, Mr. Miller was arrested for his current charges.  On

September 11, 2020, Mr. Miller was remanded to the custody of the United States

Marshall pending his trial.  On that same day he was transported to the Northern Neck

Regional Jail (hereinafter "NNRJ") where he was incarcerated waiting for his trial.

While the Government had presented evidence at Mr. Miller's detention hearing that he

was healthy, Mr. Miller entered the NNRJ with the COVID-19 comorbidities of clinical

obesity, COPD and sleep apnea.[1]  Beginning in the middle of November, 2020, Mr.

Miller and the Government began serious plea agreement negotiations.  The entire

framework of a plea agreement for two cases was created by the parties.  On November

23, 2020, and December 2, 2020, Mr. Miller had completely discussed the framework of

a plea agreement and had agreed in principle to plead guilty.  Counsel communicated Mr.

---

[1] Following this document are copies of the exhibits that the Government introduced at the detention hearing in support of their argument to detain Mr. Miller.

Miller's desire to enter the plea agreement to the Government and on December 9, 2020, the Government forwarded all plea documents to counsel for signature. Unfortunately, the plea documents remained unsigned for over a month.

On December 3, 2020, Mr. Miller, along with his fellow inmates from "H Pod," purchased commissary items from the outside contractors who are allowed into the NNRJ. Mr. Miller recalls one of the contractors without full use of a mask and coughing. The NNRJ medical records reflect that Mr. Miller was seen on December 3, 2020, and "refused temp check and COVID screening;" however, at this time, Mr. Miller was feeling fine and did not suspect he had been infected with COVID-19. (Medical records are attached to this filing). By the end of the day on December 4, 2020, Mr. Miller was beginning to show the symptoms of COVID-19: some coughing and a mild fever.[2] By 2:00 p.m. on December 5, 2020, Mr. Miller was confined to his bed (still in his regular dormitory pod) and feeling increasingly worse. He was shaking with a fever and in clear respiratory distress. Mr. Miller was continuously using his CPAP machine to assist his breathing.[3] On the evening of December 5, 2020, Mr. Miller missed the "pill call" because he was unable to get out of his bed to take his regular medications.

On the morning of December 6, 2020, Mr. Miller was able to get out of bed for the "pill call." By this time, he was feeling dehydrated and still suffering the effects of the COVID-19 symptoms. While standing in the "pill call" line, Mr. Miller passed out.[4]

---

[2] Mr. Miller understands that of the 22 inmates on "H Pod," between 16-18 were infected with COVID-19.
[3] Mr. Miller was allowed to have his previously prescribed CPAP machine when he was incarcerated. Mr. Miller had slept with the assistance of the CPAP machine for years due to his previously diagnosed sleep apnea.
[4] The NNRJ medical records reflect Mr. Miller was seen on December 3, 2020, and then not again until he passed out and fell to the floor on December 6, 2020. Mr. Miller was not seen by the medical staff of the NNRJ on December 4 or 5, even though he was showing symptoms of COVID-19 and breathing with the assistance of his CPAP machine. Mr. Miller has agreed to waive any privacy rights to his medical records or medical condition so that this position paper can be filed publicly in its entirety.

When he briefly lost consciousness, he fell to the ground and hit the back of his head on the floor causing a "golf ball" size hematoma.  Mr. Miller was transported by stretcher to the NNRJ medical pod and then ultimately transported by ambulance to the emergency room of the Riverside Tappahanock Hospital (hereinafter "RTH").  Mr. Miller was assessed at the RHT and then returned the same night to the NNRJ since his condition was not considered severe enough for admission.

When Mr. Miller returned to the NNJR, he was placed on the medical pod and monitored regularly by the medical staff.  He actually began to feel better on December 8; however, on December 9 he was again transported by ambulance to the RHT where he would remain, fighting his COVID-19 infection until January 6, 2021.[5]  It is not an exaggeration to say that Mr. Miller would fight for his life while at the RHT and was lucky to survive.

On December 9, 2020, Mr. Miller was admitted to the RHT and soon transferred to the Intensive Care Unit.  As a result of the COVID-19 infection, Mr. Miller developed pneumonia and severe hypoxic respiratory failure secondary to ARDS (acute respiratory distress syndrome). While in the ICU at RHT, Mr. Miller was administered Remdesivir and Convalescent Plasma, both common treatments for COVID-19.

By December 22, 2020, Mr. Miller's condition became severe.  Mr. Miller was breathing with the assistance of a BiPAP machine which provides oxygen through forced airflow.  At this point, the BiPAP machine was providing the maximum amount of oxygen possible.  On December 22, 2020, Mr. Miller told his nurse, "I just don't have any lung capacity."  Then on the night of December 23, 2020, Mr. Miller told his nurse,

---

[5] Mr. Miller's positive COVID-19 test is attached to this document.  The test was taken on December 6, 2020, and the test results were returned on December 8, 2020.

"I feel like I am drowning."  On December 24, 2020, Mr. Miller's doctor discussed the possibility of intubation due to his severe condition.  The doctor's notes reflect, "The patient is okay with intubation, that was discussed with him today, will do arterial blood gas right now to assess his oxygen since his requiring significant amount of oxygen, his x-ray yesterday revealed worsening of the infiltrate, unfortunately we can not do x-ray right now." (typographical errors in original).  During these days of severe respiratory distress, the medical records reflect Mr. Miller's increased anxiety due to his critical condition.  As a result, he was treated with anti-anxiety medication.  Fortunately, Mr. Miller did not deteriorate any further and intubation was not required.

As Mr. Miller began to recover from the worst of his lung damage, by December 30, 2020, it took Mr. Miller approximately 20 minutes to move from his bed to the chair beside his bed with the assistance of medical staff.[6]  The nurses continued to document Mr. Miller's anxiety with the simple task of getting out of bed to sit in a chair.  Mr. Miller was discharged from the RTH on January 6, 2021, with the continued assistance of the BiPAP machine that provided him oxygen.

The treating doctor at NNRJ noted on January 7, 2021, that Mr. Miller was "very weak" and "appears critically ill."  By January 12, 2021, the doctor noted Mr. Miller was "doing slowly better" and "speaking more clearly."

On January 11, 2021, counsel was able to meet with Mr. Miller at the NNRJ. After that conversation, counsel informed the Government that Mr. Miller still intended to plead guilty.  After his life-threatening ordeal and 29 days in the hospital, Mr. Miller stayed to his word and entered a plea agreement with the Government.  While the

---

[6] Medical records are attached to this document.

pandemic was still affecting nearly every aspect of American life, Mr. Miller chose to plead guilty and avoid the need for a trial.

On March 22, 2021, Mr. Miller underwent a pulmonary function test due to his extensive lung damage caused by his COVID-19 infection.  After the test was performed, Dr. Sharma produced a report which indicates that more than two months after Mr. Miller's release from the hospital, his lung function was only 58%.  Dr. Sharma also points out that Mr. Miller's pre-existing COPD (chronic obstructive lung disease) might be also contributing to the delayed healing from the COVID-19 infection and related pneumonia.  Dr. Sharma noted that Mr. Miller suffered from ARDS (acute respiratory distress syndrome) which caused his admission to the ICU.  Her report goes on to reference a study that found ARDS survivors suffer long-term mortality at a rate between 11% and 60%.  ARDS survivors continue to present a reduced quality of life and neuropsychological disorders up to 5 years after their illness.  Dr. Sharma recommends no specific medical treatment for recovery, but encourages a balanced diet, exercise program and beathing exercised to support the recovery process.[7]

**Legal framework for "just punishment"**

Prior to the COVID pandemic, courts recognized that pre-sentence confinement conditions can support a reduced sentence.  In *United States v. Carty* the Second Circuit Court of Appeals held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."  264 F.3d 191 at 196 (2001). Mr. Carty was held in a Columbian prison with harsh conditions prior to his extradition to

---

[7] Dr. Sharma's report is attached to this document.

the United States which the Court concluded supported a reduced sentence by way of a

downward departure.  *Id.* at 194-196.[8]

Several courts have applied the same reasoning to the current COVID-19

pandemic in the context of compassionate release pursuant to 18 U.S.C. § 3582 (c).  After

citing *United States v. Carty,* 264 F.3d 191 (2d Cir. 2001), United States District Judge

Engelmayer concluded:

> The same logic applies here.  As has been widely chronicled, the pandemic, for good and sound public health reasons relating to arresting the spread of the virus within the crowded confines of federal prisons and jails, has required extreme restrictions on prisoners' movements and visits.  It has also exposed prisoners to heightened fears of contagion and its consequences.  That risk is heightened for prisoners, such as McRea, whose medical conditions make them especially vulnerable to the most serious effects of COVID-19….  In the Court's judgement, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.  While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing. (*Internal citations omitted*).

*United States v. McRae*, 17 Cr. 643, WL 142277 *4, 5 (S.D.N.Y. January 15, 2021).  This

reasoning was used by the Court to grant the defendant's motion for compassionate

release.  *See also United States v. Rodriguez*, 00 Cr. 761-2, 492 F.Supp.3d 306, 311

(S.D.N.Y. September 9, 2020) (granting compassionate release since the "pandemic,

aside from posing a threat to Ridriguez's health [from obesity and Type II diabetes] has

made Rodiguez's incarceration harsher and more punitive than otherwise would have

been the case.); *United States v. Nunez*, 483 F.Supp.3d 280, 290 (E.D. Pa. September 1,

---

[8] See also *United States v. Sanpedro* 352 F.App'x 482, 486 (2d Cir. 2009) (summary order) (upholding the District Court's rationale that one factor for a low-end guideline sentence was harsh pre-trial conditions); *United States v. Salvador*, No.98 Cr. 484 WL 2034637 at *4,5 (S.D.N.Y. July 19, 2006) (holding that the defendant's incarceration in a Dominican Republic jail pre-trial warranted a downward departure); *United States v. Torres*, No. 01 Cr.1078, WL 2087818, at *1, 2 (S.D.N.Y Aug. 30, 2005) (departing downward by one offense level due to the harsh pre-trial conditions in a Columbian prison); *United States v. High*, 997 F.3d 181 (4th Cir 2021) (recognizing that COVID-19 may meet the extraordinary and compelling standard while affirming the District Court's denial of a motion for compassionate release.)

2020) (granting compassionate release where the defendant risked COVID-19 infection and suffered from obesity, gout and tuberculosis.) *United State v. Hatcher*, 18 Cr. 454-10, WL 1535310 (S.D.N.Y. April 19, 2021) (granting compassionate release after the defendant had been vaccinated due to "harsh conditions of confinement" due to "fear and anxiety" of contracting COVID-19 while incarcerated.)

The reasoning behind granting compassionate release in each of these cases was that the combination of comorbidity (even simply obesity) and fear of contracting COVID-19 create extraordinary and compelling reasons for early release pursuant to 18 U.S.C. § 3582 (c). While these cases are compassionate release cases the comparison between these cases and Mr. Miller's sentencing are unavoidable. In fact, 18 U.S.C. § 3582 (c) requires consideration of all 18 U.S.C. § 3553(a) factors.

The major difference between the cases where defendants were granted compassionate release and Mr. Miller's case is that he actually contracted COVID-19 and spent 29 days in the hospital. He had previously been diagnosed with COPD, was clinically obese and slept with the aid of a CPAP machine on a nightly basis. He was uniquely susceptible to hospitalization due to his comorbidity if he contracted COVID-19. If simply the fear of contracting COVID-19 creates an extraordinary and compelling reason for release, actually contracting COVID-19 and feeling like you are drowning from the resulting fluid in your lungs is a compelling reason for a variance sentence.

Beyond the harsh impacts of contracting COVID-19 while waiting for trial, Mr. Miller faces the lingering possibility, while rare, of reinfection. The CDC website sates that reinfection is rare, but that some reinfections are to be expected. https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html If Mr. Miller

were to be reinfected, he still suffers from the comorbidity that complicated his original recovery, but he would enter that battle with the lingering effects of his pervasive lung damage.  And while Mr. Miller has been vaccinated for COVID-19, there still exists the possibility of still being infected.  The CDC reports that as of July 12, 2021, exactly 5,492 people have been hospitalized or died from COVID-19 infections after being vaccinated, so called "break-through" cases.  https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html.[9]  The bottom line is that COVID-19 still poses a threat to Mr. Miller's health.

Additionally, the BOP is still struggling to adequately address the needs of patients during the pandemic.  On April 14, 2021, Dr. Homer Venters testified before the U.S. Senate based on his experience as an epidemiologist and years of medical work within the BOP.  Dr. Venters statement reads in part, "My greatest area of concern is that pre-existing deficiencies in the health services provided to people in BOP custody, which contributed to the spread and lethality of COVID-19, remain unaddressed.  Core areas of health services, including sick call, chronic care and behavioral health services remain substandard across many BOP settings.  Without a fundamental shift in how BOP approaches these health services, people in BOP custody will continue to suffer from preventable illness and death, including the inevitable and subsequent infectious disease outbreaks."  *Health Priorities for the Federal Bureau of Prison*, Statement of Dr. Homer Venters, United States Judiciary Committee, April 14, 2021.  So, not only has Mr. Miller's pre-trial incarceration been "more punishing," there still exists the chance of reinfection while in the inadequate health care system of the BOP.

---

[9] The CDC is not currently tracking the number of break through cases that do not result in hospitalization or death.

As noted in Dr. Sharma's report, Mr. Miller's recovery would be assisted by an exercise regimen and breathing exercises.  To date, Mr. Miller has not been shown any breathing exercises and has not been availed of the opportunity to engage in physical exercise to aid his recovery.

### 2. "deterrence to criminal conduct"

A sentence of sixty months incarceration would accomplish the goal of affording adequate deterrence to criminal conduct.

The difference in punishment between "receipt" and "possession" calls into question whether an increased sentence due to the mandatory minimum required of "receipt" offenses accomplishes deterrence under 18 U.S.C. § 3553(a)(2)(B).  First, we must examine the inevitable truth that the only real difference between these two charges is the punishment:

> In its current form, 18 U.S.C. § 2252 imposes a mandatory five-year minimum sentence for defendants convicted of "receiving" child pornography, but "possessing" child pornography carries no mandatory minimum sentence. There is simply no meaningful distinction between these two offenses or logical reason to punish "receiving" child pornography more severely than "possessing" it. Like all other types of contraband, it is by definition impossible to "receive" child pornography without "possessing" it, at least at the moment "receipt" occurs. Likewise, it is impossible to "possess" child pornography without "receiving" it, except for the rare instance when the possessor is the one who produced the pornography. So, as Judge Posner recognized, "the puzzle is why receiving . . . should be punished more severely than possessing, since possessors, unless they fabricate their own pornography, are also receivers."
>
> This "puzzle" has significant ramifications for sentencing in the vast majority of federal child pornography cases. Most child pornography offenders are charged with "receiving" and/or "possessing" child pornography under § 2252. Of these offenders, almost all use computers to download and eventually store images. Therefore, the typical child pornography downloader may be charged with "receipt," "possession," or both at the discretion of the prosecutor. This discretion furnishes the prosecution with the power to determine the defendant's ultimate sentencing fate simply because § 2252 punishes "receipt" more severely than

"possession." When a prosecutor elects to charge a defendant with "receipt" instead of, or in conjunction with, "possession," he or she strips the judicial branch of its authority to fashion an appropriate sentence in light of the defendant's conduct. Federal prosecutors, aware of the recent judicial assault on the Guidelines, can always hedge the risk that a judge will depart downward by charging defendants with just "receipt." This effectively ties the judge's hands and ensures that the defendant will serve five years in prison if convicted, regardless of what he would have been sentenced to had he been convicted of "possession" alone. Allowing prosecutors to exercise arbitrary discretion of this nature subverts our constitutional structure and further exacerbates the problems associated with child pornography sentencing.[10]

Next, we must consider whether the arbitrary increase in sentence serves as a deterrent or if it is "greater than necessary" to accomplish deterrence.  In 2017, Senior United States District Judge Jack B. Weinstein conducted an evidentiary hearing regarding the Government's claim that a lengthy sentence would create deterrence.[11] During the hearing, expert testimony was presented that "although general deterrence is one of the essential justifications for criminal punishment, the deterrent effect of criminal sanctions for gun violence are specific to the risks of detection, not the severity of punishment…a 'rational offender' will decide whether or not to commit a crime by weighting the benefit of not committing a crime with the benefit of committing the crime without being caught and the benefit of committing a crime that results in being caught and punished."[12]  The Court further concluded from the expert testimony that a lengthy sentence would not achieve specific deterrence for the same reasons.[13]  In fact, the expert was testifying to the conclusion of the majority of experts, "Most of the studies agree there is very little deterrent effect associated with lengthy costs of punishment.  That if

---

[10] Stephen L. Bacon, *A Distinction Without a Difference: "Receipt" and "Possession" of Child Pornography and the Double Jeopardy Problem*, Univ. of Miami L. Rev. Vol. 65, 1027, 1030, 1031 (2011) (internal citations omitted).

[11] United States v. Lawrence, 254 F. Supp. 3d. 441 (E.D.N.Y. 2017).  Mr. Lawrence was charged with firearm-related offenses; however, the testimony focused on research that covered criminal activity generally.

[12] *Id*. at 443.

[13] *Id*. at 447.

there is a deterrent effect from criminal justice activity, from enforcement activity, it's in the risk of apprehension. … But the consensus of the literature is that deterrence effects really stop there; that lengthy sentences don't add much to the cost benefit calculation. Most offenders have a hard time seeing, really, the difference between 3 years, 5 years, 10 years, or 20 years [of incarceration]."[14]

When there are significant questions regarding an increased sentence and the value of deterrence, it is most poignant when two identical offenses carry significantly different punishments.  Since punishment for "possession" of child pornography accomplishes deterrence at a shorter sentence, then increased punishment for the same offense does not serve to accomplish additional deterrence.  Since a lesser sentence can accomplish deterrence, a variance is warranted in this case since the lengthier sentence is "greater than necessary" to accomplish the goals of deterrence.

### 3.  "protect the public"

A sentence of sixty months would serve to protect the public.  Mr. Miller has no criminal history and consequently has never been incarcerated.  Given this experience and his age, the public is adequately protected from Mr. Miller for the sixty months of incarceration and into the future.  Additionally, restrictions will be placed on Mr. Miller's activities during supervised release to ensure the safety of the public.

C.    The next relevant sentencing factor contemplated by 18 U.S.C. § 3553(a) is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct…."

---

[14] *Id*. at 444.  *See generally*, The Nat'l Rsch. Council, The Growth of Incarceration in the United States: Exploring Causes and Consequences 5 (Jeremy Travis et al., eds. 2014).

The original criminal complaint in this case charged Mr. Miller with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(b).  When Mr. Miller was indicted, the charge was brought as receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A).  Consequently, Mr. Miller faces a five year mandatory minimum sentence.  As early as 2012, the United States Sentencing Commission began to use statistical evidence to examine the non-production child pornography offenses and sentences under U.S.S.G. § 2G2.2.   The reasons for the examination included "a steady increase in the percentage of sentences imposed below the applicable guideline range…which indicated that courts increasingly believed the sentencing scheme for such offenses [non-production child pornography] was overly severe."  United States Sentencing Commission, *Feral Sentencing of Child Pornography:  Non-Production Offenses*, 1, June 2021, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.  In 2012 the Sentencing Commission concluded, "The changes in computer and internet technology typically used by non-production child pornography offenders rendered the sentencing scheme insufficient to distinguish between offenders with different degrees of culpability."  *Id*.  The Commission also examined the mandatory minimum sentence required by a receipt charge:

> The Commission also recommended that Congress align the statutory penalty schemes for receipt offenses (requiring a five-year mandatory minimum sentence) and possession offenses (requiring no mandatory minimum sentence). The Commission noted that Congress's prior rationale for punishing receipt more severely than possession had been largely eliminated. Specifically, the underlying offense conduct in the typical receipt case was indistinguishable from the typical possession case, yet widespread sentencing disparities existed among similarly situated offenders sentenced under the non-production child pornography guideline based largely on whether they were charged with receipt or possession. The Commission also noted that Congress may wish to revise the penalty

structure governing distribution offenses to reflect the evolution of technologies used to distribute child pornography and to differentiate between different types of distribution.

*Id*. at 2.  Obviously, the Sentencing Commission's suggestions fell on deaf ears and last month the Commission noted:

> To date, Congress has not implemented the Commission's statutory or guideline recommendations. Therefore, §2G2.2 remains largely unchanged, with the guideline enhancements for non-production child pornography offenders at issue in the 2012 *Child Pornography Report* still in effect. As a result, judges have continued to sentence most non-production child pornography offenders below their guideline ranges, most often by imposing variances pursuant to 18 U.S.C. § 3553(a).

*Id*. at 3.

The argument here is not that Congress should change the law (although that seems appropriate), the argument is that since Congress has not changed the laws, courts have imposed sentences below the guideline range minimum.  Mr. Miller operated within the structure of the current legal framework.  He pleaded guilty to receipt of child pornography.  While the Sentencing Commission has argued for nearly a decade that Congress should "align' the penalty scheme, Mr. Miller was within the small percentage of people who pleaded guilty to receipt of child pornography (with the consequential mandatory minimum).  For fiscal year 2020, there were 13% of offenders sentenced for receipt of child pornography, while 41.9% of offenders were sentenced for possession of child pornography (the remainder were sentenced for trafficking child pornography).  United State Sentencing Commission, *Quick Fact—Child Pornography Offenders,* 2020, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY20.pdf.

18

For fiscal year 2020, the national average sentence for offenders convicted of receipt of child pornography was 83 months incarceration.  *Id.*  Further, the national average sentence for all child pornography offenders is well below the sentencing guideline minimum as demonstrated in the graph below:



¹ Child pornography offenders are those convicted of

United State Sentencing Commission, *Quick Fact—Child Pornography Offenders,* 2020, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY20.pdf.

As noted below, only 30% of offenders received a guideline sentence and 60% of offenders received a variance sentence (the remainder received some form of departure).

19

### Sentences Relative to the Guideline Range

- 39.2% of child pornography offenders were sentenced under the *Guidelines Manual*:
    - ♦ 30.6% of all child pornography offenders were sentenced within the guideline range.
    - ♦ 5.5% of all child pornography offenders received some other downward departure.
        - ◊ Their average sentence reduction was 41.6%.
    - ♦ 2.1% of all child pornography offenders received a substantial assistance departure.
        - ◊ Their average sentence reduction was 41.4%.
- 60.8% received a variance:
    - ♦ 58.5% of all child pornography offenders received a downward variance.
        - ◊ Their average sentence reduction was 38.5%.
    - ♦ 2.3% of all child pornography offenders received an upward variance.
        - ◊ Their average sentence increase was 57.3%.

United State Sentencing Commission, *Quick Fact—Child Pornography Offenders,* 2020, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY20.pdf.

The number of variance sentences in **all** of the child pornography cases in the Eastern District of Virginia is even higher as shown by the following chart from the United States Sentencing Commission:

**Eastern Virginia**

| | | WITHIN GUIDELINE RANGE | | DEPARTURE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
| **TYPE OF CRIME** | **TOTAL** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** |
| **TOTAL** | **805** | **486** | **60.4** | **6** | **0.7** | **33** | **4.1** | **0** | **0.0** | **36** | **4.5** | **244** | **30.3** |
| **Child Pornography** | **31** | 5 | 16.1 | 1 | 3.2 | 0 | 0.0 | 0 | 0.0 | 4 | 12.9 | 21 | 67.7 |

United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2020, Eastern District of Virginia*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/vae20.pdf.[15]

Considering both the average sentence nationally the and the extraordinary percentage of variance sentences in the Eastern District of Virginia, a sentence within the guideline range would result in a disparate sentence for Mr. Miller.  Admittedly, this calculation considers only the possession of child pornography Count.  However, the reasoning remains sound, particularly given the fact that the fraud offenses alone would have resulted in a significantly lower guideline range and only added one offense level to the overall calculation.  (PSR at 20-22).  The reasoning behind the prevalence in variance sentences applies squarely to Mr. Miller's case.  Again, just last month the Sentencing Commission explained the phenomenon:

> Because enhancements that initially were intended to target more serious and more culpable offenders apply in most cases, the average guideline minimum and average sentence imposed for non-production child pornography offenses have increased since 2005.  The average guideline minimum for non-production child pornography offenders increased from 98 months in fiscal year 2005 to 136 months in fiscal year 2019.  The average sentence increased more gradually, from 91 months in fiscal year 2005 to 103 months in fiscal year 2019.

United States Sentencing Commission, *Feral Sentencing of Child Pornography:  Non-Production Offenses*, 5, June 2021, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.[16]

D.     The last relevant sentencing factor contemplated by 18 U.S.C. § 3553(a) is "the need to provide restitution."

---

[15] These numbers reflect all offenders sentenced for every child pornography offense, they do not reflect only non-production offenders.

[16] These numbers reflect the entire set of offenders sentenced for non-production child pornography; they include trafficking of child pornography.

There is undoubtedly significant restitution to be paid to all of the victims in this case.  Mr. Miller is capable of serving a period of incarceration and regaining employment to repay restitution.  While his actions during his period of criminal activity were selfish and destructive, he intends to dedicate himself to repaying those he has harmed by meeting his restitution obligations.

Mr. Miller has written letters of apology to each of the fraud victims.  One of those letters has been attached to this documentm, for the Court's review.  All of the letters will be forwarded to the Government so that they may be delivered to each victim.

**CONCLUSION**

As previously considered, this case is devastating.  Mr. Miller's actions brought pain and financial loss to many and the Court has to determine appropriate punishment for this entire case.  While this position paper has focused largely on Count Three's receipt of child pornography, that is not intended to diminish or ignore the fraud convictions.   The reason for the extensive focus on Count Three is that the mandatory minimum for Count Three exceeds the guideline range for the fraud offenses, had they been alone.

For all of the reasons outlined above, Mr. Miller asks the Court to vary from the sentencing guideline range and impose a sentence of sixty months incarceration.

Respectfully submitted,
GORDON G. MILLER, III

By :_____/s/_____
                    Counsel

22

George A. Townsend, IV, Esquire
P.O. Box 634
Midlothian, Virginia 23113
Tel.  (804) 248-0400
Fax  (804) 464-2141
VSB No. 41972
gtownsend.crimlaw@me.com

CERTIFICATE OF SERVICE

I do hereby certify that on the 22nd day of July 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF filing system which will then send a notification of such filing (NEF) to counsels of record.

Katherine Lee Martin
Office of United States Attorney
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone: 804-819-5400
Fax: 804-771-2316
Katherin.Martin@usdoj.gov

Kevin Elliker
Office of United States Attorney
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone: 804-819-5400
Fax: 804-771-2316
Kevin. Elliker@usdoj.gov

_____/s/_____

George A. Townsend, IV, Esquire
P.O. Box 634
Midlothian, Virginia 23113
Tel. (804) 248-0400
Fax (804) 782-0115
VSB No. 41972
gtownsend.crimlaw@me.com