IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cr-109-JAG |
| | ) | |
| GORDON G. MILLER, III | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## UNITED STATES' POSITION ON SENTENCING

Gordon Miller's conduct entailed three disturbing criminal schemes: a $1 million investment fraud scheme; a $300,000 federal contracting fraud scheme for which he laundered money at a check-cashing store; and an extraordinary course of receiving of child pornography, including depictions of prepubescent minors, sadistic and masochistic conduct, and exploitation of toddlers. As explained below, application of the § 3553(a) factors—in particular, the breadth and seriousness of Miller's offenses and the need to provide just punishment, afford adequate deterrence, and protect the public—supports a significant sentence of imprisonment. The Court should vary upward from the properly calculated Guidelines range of 108 to 135 months' imprisonment and impose a sentence of 151 months.

## Discussion

During sentencing, federal courts must follow a multistep process that analyzes both procedural and substantive concerns. First, the court must correctly calculate the applicable Guidelines range. *See Gall v. United States*, 552 U.S. 38, 49 (2007). Second, "the court must determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011) (internal quotation marks omitted). To the

extent the Court deems some deviation from the Guidelines range appropriate, the Court must give serious consideration to the extent of the deviation and must adequately explain it "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 365 (internal quotation marks omitted). In all events, the Court must impose a sentence that takes into consideration the factors listed under 18 U.S.C. § 3553(a). *See id.* at 364.

## I.     The Presentence Report correctly calculates the applicable Guidelines range.

The United States has no objections to the Presentence Report (PSR). His wire fraud and money-laundering convictions carry statutory maximum penalties of 20 and 10 years, respectively. *See* 18 U.S.C. §§ 1343, 1957. For receiving child pornography, Miller faces a mandatory minimum of 5 years' imprisonment with a statutory maximum sentence of 20 years of imprisonment. *See* 18 U.S.C. § 2252A(b)(1). The PSR correctly calculates a total offense level of 31 (after a 3-level reduction for acceptance of responsibility). With Miller's criminal history category of I, that results in an advisory range of 108 to 135 months' imprisonment.[1] Due to the child pornography offense, the Court must impose at least 5 years of supervised release with a maximum term of life. *See* 18 U.S.C. § 3583(k).

## II.    The sentencing factors under 18 U.S.C. § 3553 support a 151-month sentence.

Under 18 U.S.C. § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. In determining a particular sentence to be imposed, the Court shall consider:

> (1)     the nature and circumstances of the offense, and the history and characteristics of the defendant; and
>
> (2)     the need for the sentence imposed—

---

[1] Under the government's plea agreement with Miller, the United States has agreed not to recommend a total sentence of more than 151 months. *See* ECF No. 30 at ¶ 5.

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The factors also include "the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct." *Id.* § 3553(a)(6).[2]  To reach the appropriate sentence, "the sentencing court must apply the relevant § 3553(a) factors to the specific circumstances of the case before it." *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009).

### A.   Nature and Circumstances of the Offense

Miller pleaded guilty to a single charging document and will face a single sentencing event under his plea agreement with the United States.  But his criminal conduct covered a spectrum of offenses, including multiple fraud schemes, witness tampering, money laundering, and child exploitation—any of which would have been significant by itself.  Notably, the full scope of these offenses came to light only after Miller rejected the opportunity to resolve the first fraud scheme in 2019.  All told, the nature and circumstances of Miller's crimes and the investigation into them illustrates his stubborn refusal to play by the rules, respect the dignity of others, or put others' interests ahead of his own.

---

[2] Section 3553(a) also requires consideration of the kinds of sentences available, the applicable Guidelines range, pertinent policy statements issued by the Sentencing Commission, and the need to provide restitution to victims.  *See* 18 U.S.C. § 3553(a)(3)–(5), (7).

**1.  *In 2017, Miller's multi-year contracts began to dry up.***

Gordon Miller's career revolved around software design.  As relevant here, he used three companies to accomplish this work.  First, in 1994, Miller formed G3 Systems, a company he touted for its expertise in user interface design, software engineering, training and development, and modeling and simulation.  G3 Systems' legitimate work included, for example, website hosting and design for small businesses as well as software design.  Over the years, Miller employed several computer specialists who performed the technical work for G3 Systems' clients, several of which were federal agencies.  Second, as far back as 2010, Miller was also associated with "Company 1," an e-learning company based in Iowa, which brought Miller on due to his geographic proximity to federal government clients.  Finally, in 2008, Miller formed G3i Ventures, an apparent venture-capital company that he claimed "serve[d] early state and emerging growth companies through a unique strategy based on dramatically increasing revenue in order to minimize the need for additional future investors thus maximizing founder value and preserving valuable founder equity."  *See* PSR ¶¶ 14, 18–19.

In 2017, Miller, through G3 Systems and Company 1, received final payments for the work performed on several multi-year federal contracts.  The termination of those federal contracts precipitated a substantial drop in regular income for Miller.  He was behind on his taxes to Virginia and federal authorities, was supporting a family of five, and, as explained later, financing intimate relationships with various women.  So, following the loss of that income, Miller began to engage in overlapping schemes to defraud and conceal income that otherwise might have been used to satisfy outstanding bills.  *See* PSR ¶¶ 14, 18–19.

**2.** ***Starting in 2017, Miller obtained more than $1 million in an investment fraud scheme that duped 10 investors.***

The Federal Bureau of Investigation (FBI) and United States Postal Inspection Service (USPIS) began investigation Miller in 2019 based on complaints arising from an investment-fraud scheme that began in 2017. That year, Miller joined Quora.com, a question-and-answer forum where he represented himself as an entrepreneur with expertise in investing in technology companies. He made numerous posts on myriad topics, including finance, investments, and technology. In the "Credentials & Highlights" section of his Quora profile, Miller claimed he graduated from Virginia Tech with a Ph.D. in "Human-Computer Interaction & Computer Science." In truth, Miller never obtained any doctoral degree anywhere. *See* PSR ¶¶ 14

Starting in February 2017, Miller intimated on Quora that individuals could partner with him through "private debt instruments"—loans with interest rates that turned out too good to be true—which prompted many of his eventual victims to contact him for more information. PSR ¶¶ 14. One example of this kind of mass-marketing from May 2017 is shown below[3]:



---

[3] This post, like many of Miller's postings, remains active on Quora:
https://www.quora.com/Why-does-Gordon-Miller-do-private-debt-placements-at-20-a-year-when-he-can-get-cheaper-loans-from-a-bank

Ultimately, Miller solicited 9 individuals representing 10 investors who collectively gave him approximately $1 million.[4]  Miller principally met these individuals through his activity on Quora, with additional investors recruited by those first-phase Quora recruits who were not yet wise to his scheme.  *See* PSR ¶¶ 14, 20.   Miller's representations to and arrangements with these individuals varied, but they included the lies and omissions on the use and security of the funds.  *Id.* ¶ 14.   Miller did not tell his investors that he would use their funds for his personal and business debts, as well as personal expenses such as groceries, restaurants, hotels, payments to female acquaintances and girlfriends or "sugar babies," and various retail and service charges.

Miller's communications with victim N.P. typified the exchanges he had with his "investors."  *See* Exhibit 1.  After N.P. contacted Miller regarding a Quora post about the private debt instruments and asked about investing more than $100,000, Miller responded with several "offerings" that varied based on the amount of money invested, the term of the repayment, and the rate of return.  For example, "Option 1" involved "$100,000 paid back $9,166.67 per month over 12 months returning 18% for $110,000."  "Option 2" involved "$100,000 paid back $5,000.00 per month over 24 months returning 18% for $120,000."  Miller also represented how N.P.'s money would be used:  "to expand cash flow producing companies in our portfolio that are producing a great[er] than 25% internal rate of return."  Miller claimed "[t]he increased revenue and profits pay for the payment."

To further induce investment, Miller told N.P. that the note would be "secured by the value of my various positions in all our companies at www.g3.co."  That link directed a

---

[4] The PSR notes "approximately 10 individuals, representing 11 investors."  PSR ¶ 20.  The correct figures are 9 and 10, respectively.  *See* PSR ¶ 21. The reason there were more investors than individuals is because one investor was a company for which one of the individual investors was the majority shareholder.

prospective investor to one of Miller's websites, which listed various companies apparently associated with Miller or G3 Systems.  Miller highlighted two of these "featured company[ies]" in his e-mail, including "Company H" ("over $40M in revenue per year," he wrote) and Company 1 ("$9.9M in Dept of Defense [and] other contracts").  In fact, representatives of "Company H," a software company based in Blacksburg, Virginia, told investigators that Miller was not involved with the company after he was bought out of his investment in about 2015.  And the owner of Company 1 told law enforcement that Miller had no authority to use that company or its assets as security for any transactions.  *See* PSR ¶ 22.

Unfortunately, the investors didn't know Miller didn't have a Ph.D., that Miller didn't have sufficient value in a portfolio of companies to secure his investments, or that Miller would not be using investor money to "expand the cash flow" of anything other than his own bank accounts.  Based on Miller's misrepresentations and omissions, N.P. wired $100,000 to a G3 Systems bank account in June 2017.  In the related promissory note, Miller promised to make monthly $5,000 payments over 24 months, which would net N.P. a total return of $120,000.  Miller made six payments to N.P. between August 2017 and January 2018.  Unbeknownst to N.P., Miller had exhausted the $100,000 within two months of receiving it, spending the funds on business loans, personal debts, other investors' interest payments, cash withdrawals, and other personal expenses.

On February 20, 2018, Miller sent his investors an e-mail explaining that the February interest payment would be delayed due to an unforeseen delay in the closing of "a cash out transaction."  He promised to make up for it with a "10% late payment penalty."  A month later, on March 13, Miller again e-mailed to justify a delay and promised to catch up by March 20.

On March 19, 2018, the day before Miller was supposed to make his promised interest payments, he sent another e-mail to his investors with the subject "PROMISSORY NOTE RESTRUCTURE PROPOSAL." In that e-mail, Miller announced for the first time that he had been working on a "trading platform" application for the foreign exchange market, which was sure to net a substantial return. Given this development, Miller made several claims and offers to his investors under the following headings:

1. **"FREE MONEY"**: Miller first told his investors that any interest payments they'd received could be kept and would not be counted toward the progress on the original promissory notes.

2. **"ACCELERATION OF NOTE PERIOD"**: Miller proposed that all the promissory notes be restructured to come due in full by July 1, 2019.

3. **"HIGHER INTEREST RATE"**: Despite the promissory notes having extraordinary interest rates around 18%, Miller now promised a 50% return by July 1, 2019—"[t]he only difference here is that the monthly payment amount gets looped back into your investment to grow the compounded interest rather than being paid out monthly." In other words, *Miller would cease making monthly interest payments.*

4. **"REINVESTMENT OPPORTUNITY"**: Miller urged the investors that this would be their only opportunity to reinvest through his instruments— "anything you want in increments of $25,000."

5. **"REFERRAL BONUS"**: If any of the investors had contacts interested in joining the program, Miller promised a 10% referral bonus based on the amount the new recruit would be paid out. The referral bonus, of course, would be added to the original investor's final payout. Miller claimed to have "a limited number of total positions that we can accept, and a limited total dollar amount to be returned."

6. **"REVENUE SHARE"**: Miller suggested his investors would be able to convert their total payout into a revenue share of the "AI platform" and estimated that such a decision could result in upwards of $7.2 million to be split up among willing investors.

7. **"TIME IS OF THE ESSENCE"**: Miller urged his investors to respond quickly and no later than March 31—12 days after his e-mail. Those uninterested could continue in the original agreement with continued monthly payments. "If on the other hand," Miller preened, "you think this is a great opportunity and one that you have watched unfold and now you realize this is

8

the perfect chance to help build greater wealth, then this should offer an excellent opportunity and I am happy to offer it to you."

N.P., and several other investors, responded positively to Miller's new plan.  On March 28, 2018, N.P. invested an additional $200,000, which he sent by wire transfer to a G3i Ventures bank account controlled by Miller.  Miller memorialized the additional investment with a revised promissory note, which promised N.P. "$300,000 with interest of $150,000 ($450,000 in total) in one lump sum on or before the maturity date of July 1, 2019."  Unbeknownst to N.P., Miller exhausted the additional $200,000 investment within 6 weeks on business loans, personal debts, investor interest payments, cash withdrawals, and other personal expenses.

The following year, on the maturity date of the revised promissory note, Miller sent another e-mail to his investors, including N.P.  In that July 1, 2019 message, Miller admitted he would not be able to pay the promised amount due to a delay in the AI trading platform he had reference in March 2018.  Still, he noted various investment opportunities that had not previously been discussed, purporting to have made "progress on multiple objectives since last year."  In particular, he claimed to be "working on a deal in North Africa that is a $1.5B opportunity" and could net him a lump sum payment of $15 million.  Miller proposed an extension of the maturity date of the promissory note with the promises of additional interest and penalties.  In that e-mail, Miller cautioned the investors against "taking hasty legal action that would jeopardize repayment for everyone … and public negative comments about this since that will also serve to undermine our progress going forward."  Shortly thereafter, investors began to contact law enforcement, hastening the end of Miller's scheme.

To date, only one of Miller's investors received the return of his principal, and none of the investors received the full amount of money that Miller promised.  In total, Miller induced 9 individuals representing 10 investors between February 2017 and April 2018.  They collectively

paid Miller $1,045,000 and received back only $220,100.  N.P. received only $30,000 of the

$300,000 he'd invested with Miller.  Three investors got nothing.  And at least one of Miller's

victims experienced substantial financial hardship because of this offense.  *See* PSR ¶ 30.

### 3.  *Miller engaged in witness tampering during the federal investigation of his investment fraud scheme.*

Miller knew he was the subject of a federal fraud investigation as early as August 12,

2019, when federal agents visited his home to attempt an interview.  Miller then attended a

meeting at the U.S. Attorney's Office in late September 2019, with his then-retained counsel,

where he was confronted with evidence related to the investment fraud scheme, including his

misrepresentations to investors and financial analyses showing how their money had been spent.

After that meeting, Miller declined to engage in pre-indictment plea negotiations.  He was

formally served a target letter in December 2019, which advised him that he was the target of a

federal investigation and that investigators had obtained evidence suggesting he'd engaged in

various violations of federal criminal law, including wire fraud.  *See* PSR ¶ 32.

After he received the target letter, Miller had conversations with several fraud victims

regarding contacts from the FBI.  For example, after N.P. was contacted by federal agents, Miller

advised him that "their evidence is based on lies and conjecture and will not hold up in court, so

I'm not worried."  Miller later told N.P. the government was "unfairly treating me like a criminal

when I am not."  After N.P. received a subpoena to testify before the grand jury, Miller advised

"[t]here is no evidence of fraud … just all lies, conjecture and innuendo."  *See* PSR ¶ 32.

Another investor, E.K., likewise notified Miller in June 2020 that he had been

subpoenaed to testify before the grand jury on July 8, 2020.  Miller responded, "This is the 3rd

grand jury shot and still no case. … They have nothing."  Miller added, "now the FBI

interference is disrupting my ability to execute. … If not for the FBI interference in August 2019

everyone would have been paid by now."  Later, Miller told E.K., "Since one of my proposed charges is 'witness tampering',[5] I will wish you all the best in your appearance. I'm not trying to sway your opinion only trying to provide some much needed context. Simply tell the truth as you know it and it will all unfold as it is supposed to."  Miller concluded, "This will be my last communication for obvious reasons."  Nevertheless, on July 3, 2020—the Friday before E.K.'s July 8 grand jury subpoena date—Miller sent E.K. an unsolicited message regarding a purported business deal in Singapore and concluded, "These legal delays are unfortunate, but also unfounded. I am confident I will be able to demonstrate my innocence of any potential charges beyond a reasonable doubt and continue moving forward as promised."  *See* PSR ¶¶ 33, 34.

### 4. *Miller also engaged in a scheme to defraud a federal government contractor through fictitious timesheets.*

Although Miller didn't know it at the time he sat down at the U.S. Attorney's Office, investigators had developed leads on an additional fraud scheme that Miller had perpetrated during the investment fraud scheme—a federal program fraud scheme involving the submission of fictitious time sheets to generate maximum billings for G3 Systems.

In 2018, while he was soliciting investors for his private debt instruments, Miller was involved in securing a subcontract from a federal prime contractor identified as "Company 2." Company 2 was bidding on a one-year preliminary contract from the United States Army to work on the Army Training Information System (ATIS).  Initially, Miller participated in that process as a member of Company 1—the Iowa-based e-learning company that had brought him on specifically to land federal contracts.  In a resume submitted to Company 2, Miller touted two

---

[5] By mid-June 2020, federal agents had executed a search warrant at Miller's residence in Glen Allen, Virginia.  Warrant documents left with Miller identified suspected violations of 18 U.S.C. § 1512(b) as one of several predicates for the search.

Ph.D. degrees from Virginia Tech: "Ph.D. Computer Science, Human Factors, 1995" and "Ph.D. Industrial Engineering, Human Factors, 1994." Company 2 relied on this information to award the subcontract work for the ATIS contract. *See* PSR ¶¶ 14, 24.

On July 17, 2018, Company 2 notified Company 1 that it had been selected as a subcontractor on the ATIS contract. But the following week, without seeking consent of the other members of Company 1, Miller notified Company 2 that the subcontract work would be performed by G3 Systems. The subsequent payments for the subcontract thus went from Company 2 to G3 Systems. On July 28, 2018, Miller sent an e-mail to the owner of Company 1, which read in part:

> As of Tuesday, G3 Systems, Inc. and G3i Ventures LLC will both close for good. The loss of our [federal] contract revenue back in August 2017 left us a hurdle that we are unable to get over. I have no other sources of income at this point except this contract from [Company 2] to [Company 1]**.** I am going to work the position myself. What We [sic] have done projects before a only a minimal load. We have $13,952 coming in from the [Company 2] effort. I would need healthcare for my me [sic] family and $9,000 of that per month if possible. I have no other options at this point.

The other owners of Company 1 did not consent to Miller taking the ATIS subcontract for G3 Systems. Company 1 did not learn that Miller had done so until in or about September 2018.

The ATIS subcontract agreement required Miller to submit monthly invoices for time and materials spent on the work. Between August 2018 and May 2019, Miller submitted signed time sheets and invoices accounting for the work of G3 Systems employees. Each invoice accounted for time billed for between two and four individuals identified as G3 Systems employees, including Miller. Company 2 paid the G3 Systems invoices in full via check. The total amount billed on those invoices was approximately $300,516.32. *See* PSR ¶ 14, 25.

Miller's invoices fraudulently overstated the work being done on the ATIS subcontract. Two individuals listed on Miller's invoices had been employees of G3 Systems but had left the

company by the end of November 2018 after Miller had not made payroll for several months. Both employees told law enforcement they had performed little or no work on the ATIS contract. They also noted Miller's desire to pay them in cash for their work in the fall of 2018, at one point driving to a Denny's parking lot near Roanoke, Virginia, where Miller handed each of them $15,000 in cash.

The third individual Miller listed on invoices from G3 Systems was an individual whom Miller identified as a "Programmer." In fact, the "Programmer" was a custodian employed by Henrico County Public Schools who also worked part-time at the ACE Cash Express branch in South Richmond where Miller cashed his subcontract checks. After Miller's two employees resigned from G3 Systems, Miller recruited the "Programmer" and obtained Company 2's approval for his work on the subcontract based, in part, on a resume that Miller had advised the "Programmer" to doctor to falsely indicate computer programming experience. This individual told law enforcement that he performed no work on the ATIS subcontract whatsoever except to log on to a computer portal each day and dial in to conference calls without ever participating.

### 5. *Miller engaged in unlawful monetary transactions to launder the proceeds of his federal program fraud scheme.*

Part of Miller's financial problems related to his failure to file tax returns for several years. In fact, in July 2017, Miller retained an accounting firm to provide tax compliance services, including the preparation and filing of federal and Virginia business and personal tax returns for 2011 through 2017. But on May 28, 2018, the IRS sent Miller a notice of the IRS's intent to seize Miller's property or rights to property due to unpaid taxes. In correspondence with his accountant, Miller relayed that the IRS conveyed he owed more than $300,000 in unpaid federal taxes. Similarly, on July 26, 2018, Miller e-mailed his accountant to complain that the

13

Commonwealth of Virginia had seized "all our revenue" and "put a lien on everything" due to unpaid Virginia taxes. *See* PSR ¶ 14.

When Miller asked the accountant whether Virginia would "impound the money in my accounts," the accountant replied: "Yes—they will try with any account numbers they have." The following month, in August 2018, Miller received word from his accounting firm that the firm had been able to negotiate the unpaid balance of federal taxes to approximately $157,000. The firm's e-mail to Miller indicated the IRS "will file liens until this is paid but will not levy accounts if we can propose a reasonable plan of action." *Id.*

By the time Miller received this guidance from his accounting firm, he had begun receiving substantial checks from the above-described federal program fraud scheme related to the ATIS subcontract work. During that period—from fall 2018 through early summer 2019— Miller did not deposit any of the checks he received from Company 2 directly into any bank account. Instead, Miller took each check to a branch of ACE Cash Express in South Richmond to exchange the checks for cash and sometimes money orders. When Miller received money orders, he would usually return shortly thereafter to exchange the money orders for cash. *Id.*

For example, on May 28, 2019, Miller exchanged a $49,008.96 check from Company 2— for payment of the April 2019 invoice listing 4 employees' work on the ATIS subcontract—for cash at ACE Cash Express. After paying a $1,716.30 service fee, Miller received the balance in cash.[6] In total, Miller exchanged all 9 ATIS-related checks he received at ACE Cash Express, where he paid approximately $11,000 in fees to obtain $289,989.35 in cash for the $300,516.32 written on the checks. In addition to the CGI checks, Miller exchanged approximately two

---

[6] This May 28, 2019 transaction at ACE Cash Express provides the basis for Count Two of the Criminal Information.

dozen other checks between 2018 and 2020, including checks from Virginia Tech for work performed by G3 Systems and from the liquidation of a retirement account.  In total, Miller exchanged checks written for more than $558,000 at ACE Cash Express, paid fees totaling approximately $20,000, and obtained more than $538,000 in cash.

At one point in February 2019, Miller attempted to pay his accountant for his outstanding bill using $15,000 cash obtained through the above-described check-cashing method.  After dropping off the $15,000 cash, Miller received an e-mail from his accountant advising that the accountant was "required (under penalty) to file Form 8300 to report a cash payment over $10,000."  In response, Miller asked, "Damn, you are dumb enough to report it?" The accountant affirmed the need to report the money and offered that Miller could "always come back up and pick it back up."  Miller replied, "I will indeed pick it back up if that is the case and make payment arrangements more in line with my expectations."  According to records from the accountant, Miller subsequently structured his cash payments for his outstanding balance in amounts below the $10,000 reporting threshold.

### 6.   *Miller kept a trove of more than 11,000 depictions of child pornography.*

As a result of the federal investigation into Miller's above-described fraud offenses, federal agents executed a search warrant at Miller's home in early June 2020.  That warrant authorized the search of Miller's residence and seizure of, among other things, electronic devices.  During the execution of the warrant, agents found and seized approximately 26 such devices, though they noted numerous additional devices that agents did not believe had been used in the fraud schemes, such as older computers or storage drives that appeared out of use.

During the preliminary examination of Miller's devices, FBI personnel discovered a series of folders on an external hard drive containing pornographic material.  Soon after, agents determined several of these images depicted child sexual abusive material (CSAM).  Agents also

determined that Miller's iPhone had internet searches including "kid naked at home" and "mother daughter threesome."  And agents saw Miller's devices showed web history at sites known by law enforcement to be places where individuals collect, trade, and distribute CSAM.

As a result of these discoveries, law enforcement obtained a second search warrant to authorize a follow-on search of the seized devices for CSAM-related material.  In September 2020, when Miller was arrested on a criminal complaint charging possession of child pornography, agents executed a second residence search warrant to seize more devices for CSAM-related evidence.

In total, agents seized 83 devices from Miller's home and identified more than 11,000 unique images or videos showing sexually explicit conduct involving the use of a minor.[7]  These depictions include images of the sexual abuse of prepubescent children, including sadistic or masochistic depictions or sexual abuse and exploitation of toddlers.  Agents also determined that some of the depictions were saved by Miller onto his computer by using the screen-recording feature on his computer while watching videos on CSAM websites.

### 7.  *Miller had inappropriate interactions with minors before his arrest.*

Following Miller's arrest, and while reviewing electronic devices seized in the searches executed at Miller's residence, agents determined Miller had been in communication with multiple young girls, including at least one teenager ("Minor 1") who was a minor at the time of her communications with Miller.  The conversations between Miller and Minor 1 took place on

---

[7] In total, agents identified 11,494 Category 1 files (i.e., depictions meeting the federal definition of child pornography); 33,437 Category 2 files (*i.e.*, age-difficult sexual depictions or child erotica); and 850 Category 3 files (*i.e.*, depictions containing animation of children engaged in sexually explicit conduct).  *See* PSR ¶ 26.

various communication and social media platforms, including via text message, Snapchat, and Instagram.

Miller's conversations with Minor 1 insinuated his desire to engage in sexual activities with her. During one of his conversations with Minor 1, Miller discussed an "internship" with an "in-person interview" set for the day after her 18th birthday. Miller then sent Minor 1 a package he referred to as "our pre-enrollment program." The package contained a vibrator. A few days later, Miller told Minor 1, "I've had your back for 2 years now. I just want you to follow through babe. After [your 18th birthday], I've got more than just your back." In an argument via text message about a week later, Minor 1 told Miller, "You've given us"—referring to a friend ("Minor 2") who also had interacted with Miller—"each $3500. Minor 1 added, "I've sent you underage photos." *See* PSR ¶ 28. Miller contested whether the photos were "explicit." In that same thread, after Minor 1 threatened to tell Miller's wife about the photos she shared, Miller told her, "I'll take my chances to destroy you."

Based on review of financial records, agents determined that the defendant sent approximately $2,700 to Minor 1 using the Cash App between February 2018 and February 2020—*i.e.*, between the ages of 15 and 17. During the same period, Miller also sent payments totaling more than $3,400 to Minor 1's sister and approximately $400 to Minor 2. PSR ¶ 28.

*        *        *

As the foregoing illustrates, Gordon Miller is a veritable one-man white collar crime spree. His offenses cover varying forms of fraud, money laundering, obstruction, and the exploitation of children—all of which were done either simultaneously or in succession between 2017 and 2020. These were not fleeting moments of indiscretion showing a momentary lapse in judgment. They were deliberate and calculated attempts to take advantage of others. The

17

combined nature and circumstances of his offenses call for a substantial penalty above the Guidelines range.

### B.        History and Characteristics of the Defendant

Miller's background also supports a significant sentence.  Unlike many defendants who come before the Court, Miller enjoyed many opportunities and advantages in life.  He is well-educated with multiple degrees.  He operated his own business for many years.  He employed others and maintained professional relationships that, at least for some time, were fruitful.  His education and training ought to have taught him the difference between right and wrong.  The fact that it did not raises grave concerns regarding Miller's character and capacity for duplicity.

The PSR indicates a few areas that might be used to theoretically mitigate Miller's crime sprees.  For example, as an only child, Miller faced difficulty amid his parents' deteriorating marriage.  By the time he left for college, those relationships had improved.  He eventually started his own family and fathered three children.  Unfortunately, as an adult, his relationships with his own family members were fraught.  Miller suggests through statements to the Probation Officer that medications affected his personality between 2017 and 2019.  *See* PSR ¶ 89.  But his wife reported Miller "has *always* been verbally abusive towards her and their sons."  PSR ¶ 86 (emphasis added).  And through his criminal conduct in this case, he has effectively left his family with nothing, just like the victims of his crimes.  Whatever the root of Miller's troubles with relationships, those wounds do not excuse his grift, deceit, and abuse of others.

### C.        Need to Deter Future Criminal Conduct and Promote Respect for the Law

Miller is a prime example of an individual requiring specific deterrence.  His crimes were calculated and repetitive.  With each investor, and each missed opportunity to make good on repayments, he also passed on the opportunity to tell the truth.  Instead, he doubled down on his lies and continued to take money to support his lifestyle and proclivities.  Similarly, when

presented the opportunity to work a federal contract with Company 1, Miller declined the chance to do so honestly.  These were all unforced errors that Miller must understand cannot be explained away or justified in the future.  And, of course, this says nothing of the trove of CSAM material and his inexplicable interactions with minors.  The Court must craft a sentence that shows Miller that, above all else, the exploitation of minors will never be tolerated.

Similarly, the Court must consider how to deter others as a general matter from engaging in similar conduct.  *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences.  If either is eliminated or minimized, the deterrent effect is proportionally minimized.").  That is particularly true in the case of complex fraud cases, which are difficult to detect, investigate, and prosecute.  *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation marks omitted).  Absent a substantial term of imprisonment in this case, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved.  *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976).

A 151-month sentence will send the appropriate message to both Miller and others that those who engage in this conduct will be caught and punished to the fullest extent of the law.

### D.      Need to Protect the Public from the Defendant's Future Criminal Conduct

The need to protect the public from Miller is undeniable.  Miller's crimes have hurt investors, companies, employees, and countless children.  As discussed above, a substantial penalty will ensure that Miller cannot continue to harm others through his exploitative conduct.

### E.    Substance Abuse and Mental Health Treatment or Vocational Training

According to the PSR, Miller is well-educated, having earned a college degree from Virginia Commonwealth University and a graduate degree from Virginia Tech.  PSR ¶ 94. Additional training may be appropriate to enhance his vocational skills so that he can be a productive member of society, particularly given that his chosen profession largely involved work on federal government contracts—something that most assuredly will not be an option upon release.  Miller advises he has never had any meaningful history of mental health or emotional problems or struggled with substance abuse issues.  He does experience health issues related to recovering from COVID-19, which may be considered by the Bureau of Prisons in determining the appropriate facility designation.

### F.    Need to Avoid Unwarranted Sentencing Disparities

A sentence of 151 months will not result in unwarranted sentencing disparities.  Miller's agreement to plead guilty to a single charging document covered essentially two entirely distinct courses of criminal conduct:  his multifaceted efforts to defraud and the receipt of child pornography.  Indeed, the distinction between his fraud conduct and child exploitation conduct led the United States to seek two separate indictments.  A defendant so charged would normally face separate sentencing events with each set of charges considered on their own, and the sentencing court would be well within its discretion to run those sentences consecutively.  An upward variance to 151 months—the high end of the range one level higher than the one applicable to the global resolution of Miller's charges—does not create an unwarranted disparity.

In this case, Miller's Guidelines calculations are driven by Count Three.  By their own lights, however, the applicable enhancements for Miller's child-pornography offense don't fully capture the scope of his CSAM conduct.  For example, the enhancement under § 2G2.2(b)(7)(D) for the number of images involved maxes out at 600 or more images—only about 5% of the total

number of depictions Miller had in his possession.  Varying upward from the same range as an offender with a fraction of the collection Miller had would not create an unwarranted disparity. Moreover, the Guidelines do not account for what can only be described as Miller's apparent grooming of minor females as outlined in the PSR.  *See* PSR ¶ 28.  There is no enhancement imposed here for Miller's transfer of thousands of dollars to teenaged girls who, in their own words, sent Miller "underage photos."  *Id.*

Finally, although the Guidelines apply the proper grouping calculations to account for the wire fraud and money-laundering offenses, that math adds only *one point* to Miller's offense level for also committing the $1 million investment fraud scheme, the $300,000 federal program fraud scheme, the associated money laundering, and his witness tampering.  *See* PSR ¶ 64. Given the breadth of Miller's offenses, he essentially in a class of his own.  And even if Miller weren't a class of one, others who might be similarly situated should expect a significant sentence in line with the government's request for 151 months.

### G.      Seriousness of the Offense

The Court must impose a sentence reflecting "the seriousness of the offense[s]."  18 U.S.C. § 3553(a)(2)(A).  Unfortunately, whatever sentence the Court imposes, Miller's fraud victims are unlikely to be made whole.  Miller has no assets to seize.  The money he took from most of his victims was gone before he went back to ask for more.

More tragically, there is no way to repair the abuse, humiliation, and grief Miller perpetuated in the victims of the child pornography he collected.  Unfortunately, Miller's receipt and possession of child pornography reflect one man's participation in a societal scourge of child abuse.  In 2020, the National Center for Missing and Exploited Children (NCMEC) received more than 21.7 million reports of suspected child sexual exploitation.  Most of those reports

related to apparent child sexual abuse material, online enticement of children, child sex trafficking, and child sexual molestation.[8]

The breadth of that conduct in a single year is staggering but sadly unsurprising.  Nearly forty years ago, the Supreme Court noted that "the production of pornographic materials is a low-profile, clandestine industry." *New York v. Ferber*, 458 U.S. 747, 759 (1982).  Decades later, when almost every person has a high-quality, internet-connected camera in his or her pocket, it has never been easier to secretly produce, distribute, and receive child pornography.

The tragic cycle of child pornography inflicts multiple harms. First and foremost, there is the physical abuse inherent in the act of producing child pornography.  Because the physical abuse is recorded, the act then creates "a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Ferber*, 458 U.S. at 759.  The emotional harm exists even without proving circulation, simply because the victim knows the images exist and may be seen by others.  *See United States v. Church*, 701 F. Supp. 3d 814, 820 (W.D. Va. 2010) ("A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.") (internal quotation marks omitted).  Additionally, because a minor can never consent to the creation of child pornography using their own images, the act carries an inherent violation of their right to privacy.  *See United States v. Rogers*, 587 F.3d 816, 820 (7th Cir. 2009) ("Minors lack the capacity to consent, and so sexual contact with a minor is always 'without consent.'").  And finally, the exchange of child pornography instigates the demand for further production of child

---

[8] *See* Nat'l Ctr. for Missing & Exploited Children, *Exploited Children Statistics*, https://www.missingkids.org/footer/media/keyfacts#exploitedchildrenstatistics (last visited July 23, 2021).

pornography, triggering an abhorrent cycle of abuse over and over again.  *See Osborne v. Ohio*, 495 U.S. 103, 110 (1990).

In truth, Miller's offenses are serious in ways we cannot now—and may not ever be able to—fully appreciate, much less capture with an appropriate sentence.  Even so, a serious sentence may be the only measure of justice Miller's victims can receive.

<u>**Conclusion**</u>

For the reasons discussed above, the United States respectfully requests that the Court vary upwards and impose a 151-month sentence.

Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By:        /s/
Kevin S. Elliker
Katherine Lee Martin
Assistant United States Attorneys
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 819-7417
Email: Kevin.Elliker@usdoj.gov
Email: Katherine.Martin@usdoj.gov