IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                                    Plaintiff,

                     versus        3:20 CR 109 & 116

GORDON G. MILLER, III,

                                    Defendant



Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge




August  6, 2021
Richmond, Virginia




Gilbert F. Halasz, RMR
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, Virginia 23219
(804) 916-2248

APPEARANCES


Kevin Spencer Elliker, Esq.
Assistant United States Attorney
For the United States



George Alfred Townsend, IV, Esq.
Assistant Public Defender
For the defendant


The defendant
in his own proper person

```
1            THE CLERK:  Case number 3:20 CR 109 and 3:20 CR 116.

2            United States of America versus Gordon G. Miller,

3     III.

4            Mr. Kevin Elliker represents the United States.

5            Mr. George Townsend, IV represents the defendant.

6            Are counsel ready to proceed?

7            MR. ELLIKER:  United States is ready.

8            Good morning, Your Honor.

9            MR. TOWNSEND:  Defense is prepared.

10           THE COURT:  All right.  Good morning to Mr. Elliker,

11    Mr. Townsend and Mr. Miller, all three of you.  All right.

12    We are here for Mr. Miller's sentencing.  The government

13    has moved for an upward departure, upward variance,

14    rather, to 151 months.

15           Is that right, Mr. Elliker?

16           MR. ELLIKER:  That's correct, Your Honor.

17           THE COURT:  All right.

18           Mr.  Townsend, have you had a chance to review the

19    presentence report with Mr. Miller and discuss it with

20    him?

21           MR. TOWNSEND:  Yes, sir.

22           THE COURT:  And have you gone over the standard

23    conditions of supervised release that are contained in

24    that?

25           MR. TOWNSEND:  Yes, sir, we have.
```

1          THE COURT:  Do you have any objections to the

2     presentence report?

3          MR. TOWNSEND:  No, sir.

4          THE COURT:  Thank you.

5          Mr. Elliker, have you had a chance to look at it?

6          MR. ELLIKER:  Yes, Your Honor.

7          THE COURT:  Do you have any objections to it?

8          MR. ELLIKER:  I have no objections.

9          I have two minor typographical corrections for the

10    record.  One is at paragraph -- I noted in our sentencing

11    position, paragraph 20 describing investment fraud

12    victims.  The P S R says ten individuals representing

13    eleven investors.  Those figures should be nine and ten

14    respectively.

15         THE COURT:  All right.

16         MR. ELLIKER:  And then paragraph 22, describing

17    posting of You Tube video, the date is 1999.  I believe

18    that date is 2019.

19         THE COURT:  Okay.  Thank you very much.  We will --

20    the presentence report will be directed to reflect those

21    things.  All right.

22         I will adopt the factual portion of the presentence

23    report as finding of fact in this case.  The guidelines

24    are a little complicated in this case, but I will go over

25    how they work out.

1          First of all, count one, wire fraud.  Base offense

2    level is seven.  The specific characteristics because of

3    the amount of the loss is 14 points for that.  Additional

4    two points because it was resulting in substantial

5    hardship on one or more victims.  Two points because of

6    the attempted obstruction of justice.  A total of 25.

7    With respect the money during the transaction, base

8    offense level of six, loss of money is $250,000, so 12

9    points added for that.

10          Another point because he was convicted under 18 U.S.

11    code section 1957, for a total adjusted level of 19.

12          Finally, with respect to child pornography, the base

13    offense level is 22.  Because he was not involved in

14    trafficking or other exacerbating conduct he gets two

15    points off.  But he gets two points added because of the

16    pornography involved was prepubescent, a minor.  He gets

17    an additional four points because of the nature of the

18    conduct in the pictures under guideline 2G2.2(b)(4).  He

19    gets two more points because a computer was involved.  He

20    gets five points because there were six hundred or more

21    images, resulting in total of 33 points on that.

22          He gets -- we group the offenses, he gets an

23    additional point which makes the combined adjusted offense

24    level of 34.

25          The government -- he has pleaded guilty and gets two

1    points off for acceptance of responsibility.  The

2    government has moved for the third point off, which leads

3    to a total offense level of 31, which results in a

4    guideline sentence range -- and he has no criminal

5    history -- so his guideline sentence range is 108 to 135

6    months.

7         I have received letters from a lot of people in this

8    case.

9         I have received -- I am not going to go through them

10    all.  I read them all.  From Mr. Miller himself

11    apologizing for his conducts.  From his mother, who says

12    that she doesn't quite know where he went wrong, but she

13    is happy he owned up to what he did.

14        I have received letters from representatives of some

15    of his children in the child pornography.  Talked about

16    devastating life-long impact it has had.

17        I have received letters from some of his financial

18    victims, you know, essentially reflecting that he took

19    them to the cleaners, and he robbed them not only of their

20    money but of their dignity and self respect.

21        And I have received letters from various members of

22    his family who talk about, essentially how he was an

23    abusive father, ridiculed people, cheated people in

24    restaurants.  And while his criminal history -- his

25    criminal conduct in this case doesn't encompass his whole

1    life he was apparently abusive to family members from the

2    get go of his marriage.  It is a sad picture they paint of

3    someone who essentially acted without recognition that

4    these victims of his crime were human; someone who acted

5    without any, not just empathy, not just empathy, but

6    without any recognition that these people throughout his

7    life had dreams and feelings that he routinely dashed.

8    All right.

9        I have received a motion for a variance from

10   Mr. Townsend to take him down to 60 months; and one from

11   Mr. Elliker to take the sentence up to 151 months.

12       Mr. Elliker, I will hear from you first on the

13   request for a variance, the 3553(a) factors, and the

14   appropriate sentence.

15       When you are at the podium you are welcome to remove

16   your mask, which will help my aging ears understand what

17   it is you are saying.

18       MR. ELLIKER:  Thank you.  Good morning, Your Honor.

19       THE COURT:  Good morning.

20       MR. ELLIKER:  I would note the government doesn't

21   have any evidence in this case.

22       THE COURT:  Sorry.  I apologize for that.

23       Do you have any evidence, Mr. Townsend, you want to

24   put on today?

25       MR. TOWNSEND:  Nothing in addition to what we have

1    already submitted.

2        THE COURT:  Do you have any witnesses or any victims

3    who want to say anything?

4        MR. ELLIKER:  We don't have any victims of the crime.

5    It is my understanding is the defendant's wife has come to

6    court to give a statement if you would like to hear it.

7        THE COURT:  Mr. Elliker, The Court doesn't call

8    witnesses.

9        MR. ELLIKER:  We would not plan to call her as a

10   witness, Judge.

11       THE COURT:  Okay. I don't want to make things worse

12   for her than they are.

13       MR. ELLIKER:  I understand.

14       With that, I can go straight to argument on the

15   sentencing factors and the motion for an upward variance,

16   Judge.

17       We recommended, Your Honor, a sentence of 151 months.

18   That is not a recommendation that we make lightly.

19   Recognizing the seriousness of that recommendation, we do,

20   after consulting the advisory guideline range, which is

21   the starting point for The Court in making that

22   determination today.  Primarily, as we laid out in our

23   position papers, based on the nature and the scope and

24   seriousness of the defendant's crimes, as well as the need

25   to provide just punishment to deter him and others and

1    protect the public.

2        Regarding the nature and scope, Judge, the striking

3    panoply of criminal offenses in this case, the one

4    colleague said covered the entire gamut of all white

5    collar offenses that our office investigates.  As you know

6    there is multiple schemes to defraud.  There is

7    individuals during overlapping times over a number of

8    years.  Count one outlined a calculating and controlling

9    investment fraud scheme where the defendant lied to secure

10   substantial payments, 50,000, hundred thousand, $200,000

11   transfers, and then strung these individuals along in

12   order to at first make some very brief Ponzi style

13   payments, by which I mean using the payments of one

14   individual to make another individual think that their

15   investment was coming back to them to create the guise of

16   successful investments and then shortly after that cutting

17   those payments off to create an even greater return,

18   promising them 50 percent return on their investment.  In

19   truth he spent money on his own expenses in very short

20   order, including business and personal debt, credit cards,

21   and the veneer of a lavish life style composed of

22   restaurants, hotels, and I think what is best described as

23   transactional relationships with women of varying ages.

24       He also played on his knowledge and expertise of the

25   government contracting system given that that was what his

1    business had engaged in over a number of years and used

2    that to commit a fraud scheme that underlines the money

3    laundering investigation.

4         That involves securing a one-year subcontract

5    associated with one company, and then once that

6    subcontract was awarded, taking it for his own company and

7    then submitting false invoices knowing that as long as he

8    could make it look like someone is working there because

9    of the time and materials nature of the contract, he could

10   get the maximum amount of money allowed under that

11   subcontract, which was over $300,000.  And then even went

12   so far as to recruit a lay person, someone who is employed

13   as a custodian in Henrico County Public Schools, and

14   working part time at a check cashing store where he was

15   laundering his checks to avoid tax authority, and having

16   that person pretend to be a computer programmer and then

17   submitting their time on those invoices.  Not even a close

18   call of whether that person was deserving, whether that

19   contractor should have been paying for that time at all.

20   And this obviously says nothing, Judge, of the child

21   pornography collection.

22        THE COURT:  So tell me about the obstruction.

23        MR. ELLIKER:  Yes.  So, Your Honor, the defendant was

24   aware as early as August of 2019 that authorities were

25   investigating him when he was served with a target letter

1    by FBI agents and Postal Inspectors.  Then as additional

2    victims were identified and contacted, those victims who

3    believed they were still involved in this investment

4    program would reach out to Mr. Miller, and he would wave

5    them off and say, this is a misunderstanding.  But the FBI

6    investigation is actually getting in the way of our

7    ability to repay people.  Sort of trying to implicitly say

8    the FBI is getting in the way of this.

9        The real -- the obstruction that he was actually

10   indicted on, that I think provides the clearest example of

11   obstructive conduct was when it got to the point of the

12   government subpoenaing several of these victims to testify

13   before the grand jury.  Those individuals advising Mr.

14   Miller they had been subpoenaed.  By that time Mr. Miller

15   was aware that one of the offenses he was being

16   investigated for was obstruction of justice, because it

17   was the offense listed on the cover sheet of the search

18   warrant that was left with him at his home in June of last

19   year.  Even knowing that, acknowledged to one of the

20   victims, I am not going to have any more contact with you

21   because they are investigating me for obstruction of

22   justice.  But then the Friday before that grand jury

23   testimony, reaching back out to that person to try to

24   reassure them again that everything was above board and

25   that the investigation was going away.  I think there is

1    more precise details outlining that in the P S R, but that

2    is the gist of it.

3         THE COURT:  Okay.

4         The child porn is what you were starting with.

5         MR. ELLIKER:  I would characterize that was

6    monstruous, Judge, both of terms and size and substance.

7    The FBI during the course of the fraud investigation

8    seized more than two dozen electronic devices.  During the

9    normal routine triaging process of those devices

10   identified what they believe to be child pornography.  The

11   government obtained a follow-on search warrant to then

12   search for child pornography and found scores of images,

13   and then ultimately at the time the defendant was arrested

14   last September agents knew they had left behind devices at

15   his home that they didn't think were recent enough in use

16   to have been covered by the fraud warrant.  And went and

17   collected that.  Ultimately more than 80 devices were

18   seized from the defendant's home.  And on at least 27 of

19   those, ultimately 87 identified more than eleven thousand

20   unique depictions of images that meet the definition of

21   child pornography under the federal statute.  And there is

22   three times as much of images that they determined were

23   either age difficult, stuff that clearly was pornographic

24   but they could not pin point the age of the individual, or

25   child erotica, which is not, strictly speaking,

1    pornography, which is not strictly speaking pornography,

2    but sexualized images of children.

3        And these also included screen reporting the

4    defendant made on his own lap top while browsing web cites

5    of videos which shows the basis for the government's

6    charges of receipt.  Then finally we did highlight in our

7    brief an apparent nexus between the defendant's penchant

8    for high spending and his particular sexual interest in

9    minors.  There is at least instance of where it was clear

10   that the defendant was paying money to teenage girls in

11   what I would describe as an inappropriate relationship.

12       THE COURT:  It looked to me like he was getting them

13   ready for sexual activity with him, but to his credit that

14   was to occur after they were 18.

15       MR. ELLIKER:  I think that is right.  I think that is

16   a fair characterization of the evidence.

17       THE COURT:  But his conduct to them was manipulative

18   and brutal.

19       MR. ELLIKER:  And I mean to be a man in his 50s

20   sending a 17-year-old girl, between the ages of 15 and 17,

21   more than $2,500 in cash out payments presumably for some

22   benefit to him either in real time with images that might

23   not have been child pornography, but certainly to groom

24   the possibility of a sexual relationship, and while she is

25   still 17 sending a vibrator to her home.  It may not seem

1    specifically criminal conduct in this case, but does speak

2    to the characteristics of the defendant and seriousness I

3    think is borne out by the victim's statements that you --

4    I know you have read, Judge, with victim, V H, of the

5    investment fraud scheme, says he feels humiliated, no

6    longer trusts his own judgment.  One victim, F D,

7    describes how he was planning to use the proceeds that

8    seem too good to be true to be able to take care of his

9    family.  And when he has a child born unexpectedly

10   premature had to rely on the graces of family members to

11   get him through that instead of paying himself.

12       The C P offense, sorry, Judge, the child pornography

13   offenses, obviously those are deathly serious.  And we

14   explain in our position papers the cycle of trauma that

15   even just receiving child pornography, if not involved in

16   the creation, perpetuates it.

17       As part of the process that law enforcement goes

18   through, images and videos are sent to the National Center

19   For Missing and Exploited Children, NCME, the Nickname, as

20   we call it, and they send us back a list of who have been

21   identified as known victims.  And among those there are

22   more than a hundred known victims and more than a dozen of

23   them submitted victim impact statements in this case.  I

24   think there is one that illustrates what we have

25   characterized as a vicious cycle.  The victim using the

1   name Patty, Patty describes having been abused as a

2   ten-year-old in 1973, and found out last year, 47 years

3   after, that those images were on line.  Didn't know for

4   her entire adult life until now when she is now in here

5   late 60's.  Sorry.  Late 50's.

6        She wrote to you, Judge, "I thought my photograph had

7   been destroyed.  It was then that I realized this

8   nightmare never went away at all and this reality

9   nightmare replays in my mind, as hundreds of perpetrators

10  all across the world have complete access to my body

11  whenever they wanted.  These people are viewing a damaged

12  person that took years to try to heal herself."

13       Judge, that is one victim of a collection of 11,000

14  depictions.  The defendant possessed 11,000.

15       In terms of the history and characteristics of the

16  defendant, Judge, the defendant have --

17       THE COURT:  He had all of the advantages you could

18  ask for.

19       MR. ELLIKER:  That's right.  Heis well educated,

20  experienced in his chosen profession.  And I think to his

21  credit was ultimately successful in his line of work for

22  some period of time until the contract dried up in 2017.

23  He had many opportunities to get his house in order.  I

24  think it is safe to say he knew right from wrong when he

25  engaged in a fraud scheme as he did.  The letter that was

1    submitted to The Court, Judge, I think also reveals

2    something about the defendant's perspective on this case.

3    The defense attached an example of letters sent to one of

4    the victims -- and I will say that Mr. Townsend provided

5    me additional copies this week of letters sent to all of

6    the victims in the fraud scheme, which we will pass along.

7    The letters are basically the same.  In it the defendant

8    wrote, "I accepted your money without fully disclosing the

9    risk.  I failed to notify you of my ability to repay

10   changes.  I actively encouraged you to reinvest when I

11   needed more time to pay knowing the risks were much

12   higher."  This language of "risks" --

13       THE COURT:  Like I am a regular stock broker at

14   Merrill Lynch and you are investing in banana futures.

15   That is just grandiose and minimizes the conduct.

16       MR. ELLIKER:  I think that's absolutely right, Judge.

17   This was not an investment opportunity that the victims

18   believed it was.  These were --

19       THE COURT:  Ha.

20       MR. ELLIKER:  -- for him to get money under the guise

21   of some promissory note that he thought as long as he

22   could make good on some day everybody would be happy.

23       Obviously I won't recount, Judge, the sad statements

24   provided by the defendant's own family, but I think it

25   provides additional insight that is consistent with the

1    type of person who would commit these types of crimes.

2         I don't say this, Judge, in moral judgment of the

3    defendant, obviously that is not my job, but it does

4    inform the history and characteristics of this defendant

5    in drafting a sentence necessary to achieve the goals of

6    sentencing.

7         In terms of adequate deterrence and protecting the

8    public, Judge, the fact that the defendant will be an

9    older man when he gets out of prison --

10        THE COURT:  That really doesn't make much difference.

11        MR. ELLIKER:  I agree.  There is --

12        THE COURT:  I can attest to the fact that people who

13   approach 70 are capable of all kinds of mischief.

14        MR. ELLIKER:  Particularly when the crimes here did

15   not require him to be a young agile person, it required a

16   computer screen with a connection to the internet.

17        In terms of avoiding unwarranted disparity, Judge,

18   our view is that Mr. Miller is in a class of his own.

19   Very few defendants I think would come before The Court

20   having committed these same acts, and if they did, I don't

21   think it would be unfair for them to expect the

22   possibility of a sentence of 151 months.

23        THE COURT:  How do you get -- tell me how it goes

24   from 135 to 151.  How -- do you manipulate the guidelines

25   in some way to get up to that level?

1    MR. ELLIKER:  Well, Judge, I can tell you that --

2    THE COURT:  That would be a one-level raise.

3    MR. ELLIKER:  It would be.

4    Judge, part of this was coming up with a solution for

5    a global resolution of two separate indictments because we

6    indicted the fraud scheme and money laundering and

7    obstruction as one case, and separately indicted the child

8    pornography related offenses.  And had there been --

9    proceeded to trial on both of those, we presume that there

10   would have been the possibility of, very real possibility

11   of consecutive sentences being imposed.  When you actually

12   look at -- when you look at what the fraud offenses would

13   have come out to on the guidelines, my back-of-napkin math

14   was somewhere between 46 and 57 months is what that

15   guideline range was.  And on then on the CP offense it

16   would have been somewhere between 97 to 121 months.  If

17   you combine the low end of both those ranges with the high

18   end of those ranges you end up at a much larger range of

19   between 143 and 178 assuming consecutive imposition of

20   sentences.  And 151 is at the low end of that combined

21   consecutive range, if that is what I can call it,

22   obviously, part of working out a resolution to the case

23   was, in a case like this, the government was content to

24   cabin itself at 151 months, Judge, and it seemed that that

25   was a fair way to reach that result.

1        THE COURT:  All right.

2        MR. ELLIKER:  Judge, I would briefly, I think for

3    efficiency's sake, if you would let me touch on some of

4    the defendant's arguments for the downward variance.

5        THE COURT:  Go ahead.

6        MR. ELLIKER:  So the defendant has raised COVID 19.

7    We acknowledge that he did contract and come through,

8    thankfully, COVID 19 infection in December of last year

9    through January of this year.  But as The Court knows with

10   the compassionate relief, you have to consider all the

11   3553(a) factors and not just discount a sentence simply

12   because of COVID 19.  I think that is particularly

13   important with someone who has contracted it, has received

14   the vaccine, and during that the systems substantially

15   improved efforts, to mitigate the risk.  I checked last

16   night and the BOP's web site indicates out of 130,000

17   inmates there are fewer than 300 confirmed COVID cases

18   among the inmate population at this time.

19       No doubt it has had an effect on his health.  I know

20   he is in wheelchair before The Court today.  But that

21   doesn't suggest he is a different person or affected

22   mentally.  I believe The Court will recall the February

23   plea colloquy during which The Court in asking whether

24   COVID 19 treatment affected his ability to understand what

25   is going on the defendant jokes with The Court and said

1    that the only thing it affected was his inability to

2    remember the capital of Indonesia, which is Jakarta.  So I

3    think it is clear he is all there.  That is what makes him

4    a dangerous individual to the public.

5         And then finally I think thee is a portion of the

6    presentence report that includes observations from the

7    defendant's wife that she hoped after COVID he would have

8    an epiphany, but it quickly became clear he had not

9    changed.  By the defendant's own representation in his

10   motion, his treating physician post COVID has not

11   recommended any specific medical treatment.

12        THE COURT:  All right.

13        MR. ELLIKER:  The other argument that is raised by

14   the defendant is the disparity between possession of child

15   pornography versus receipt.  Obviously receipt carries --

16        THE COURT:  I will admit that child pornography

17   punishment really doesn't make much sense, and neither do

18   the guidelines.  But it is a disturbing case here because

19   not only did he have all of this pornography, which is not

20   uncommon because they use computers and they get it in

21   volumes through the computer, but coupled with the contact

22   with minor females was particularly disturbing.

23        MR. ELLIKER:  I think -- I don't disagree with you at

24   a high level, Judge.  I would just emphasize that it

25   appears that there is an argument being made on what the

1     statutory mandatory minimums are.  Obviously Congress made

2     that decision.  But, throughout that argument I think the

3     defendant later focused on the disparities, completely

4     sets aside the fraud schemes and money laundering that he

5     engaged in.

6          And frankly, by asking for a sentence of 60 months

7     the defendant is asking The Court to sentence him on just

8     one count of a three-count criminal information.  And I

9     would disagree with the defendant, Judge.  When we sat

10    down with him a few years ago all we knew about was the

11    investment fraud scheme.  And the lead AUSA on that case

12    informed Mr. Miller if you put down your shovel, we will

13    put down ours.  And declined, as is his right to engage in

14    resolution of that.  But the investigation that followed

15    uncovered so much more.  And I think that is what The

16    Court has to consider.  And we ask The Court to impose a

17    sentence of 151 months.

18             THE COURT:  Thank you.

19             Now do you have -- his wife is here; is that correct?

20             MR. ELLIKER:  Yes, Your Honor.

21             THE COURT:  Are there any other victims who are here?

22             MR. ELLIKER:  No.

23             THE COURT:  Okay.

24             All right.  So all of those folks are observers?

25             MR. ELLIKER:  Yes.

1          THE COURT:  Thank you.

2          MR. ELLIKER:  Thank you.

3          THE COURT:  All right.

4          Mr. Townsend, let's hear from you on your request for

5     a variane and the 3553(a) factors, and an appropriate

6     sentence in this case.

7          MR. TOWNSEND:  Good morning, Your Honor.

8          Judge, I had pointed out a number of different

9     detailed things in sentencing.  I will step back and look

10    at this more broadly.

11         THE COURT:  That's a good idea, Mr. Townsend.

12         MR. TOWNSEND:  The facts are obviously devastating.  I

13    have used that word, The Court has used that.  There is no

14    doubt, is it is unavoidable for everyone involved.  There

15    is no doubt about that.

16         The Court starts with the Sentencing Guidelines.  And

17    the government says, well, no, the Sentencing Guidelines

18    aren't appropriate, we need to go above.  The defense

19    says, no, the sentencing guidelines are inappropriate, we

20    need to go below.

21         Those variant sentences are unusual sentences.  Has

22    to be something that would take us outside of the

23    guideline range.  We have to justify that.  The government

24    has to justify that or the defense has to justify that.

25         What the government is pointing to, essentially, is

1    the facts of the case.

2         And what they are pointing to at the very end when

3    you asked Mr. Elliker why, how did you get to the 151

4    months?  And what is you did?  Essentially what he says

5    is, you know, we had a solution, global resolution.  And

6    so his argument is that there is a number of different

7    offenses, and because these numbers of different offenses

8    we should have a higher sentence that should go beyond the

9    guidelines.  So that begs the question of, why?  What is

10   it about the guidelines that doesn't account for the

11   actions?  The guidelines are increased -- you know, if he

12   had just pled guilty initially to a fraud charge, the

13   government says it was 46 to 57 months, back-of-envelope.

14   I had it somewhere between two and three years is what I

15   think the sentence probably would have been if it had just

16   been the fraud, even had the fraud loss numbers that we

17   have.  And then he doesn't -- we answer in to receipt of

18   child pornography, not possession, receipt.  And the

19   sentence, the guideline range is now three times that.

20   And the guidelines are also, you know the reason that it

21   only goes up one level is because the child pornography

22   guidelines are so draconian.  I think The Court knows that

23   and recognizes that.  So that is the reason that the

24   guidelines only go up one level.  And he -- they did that.

25   That happened for him.  So that takes into consideration

1    the fraud offense and also takes into consideration the

2    child pornography.

3        The government also then says it is the number of

4    child pornography images, and then the contact with

5    children.

6        Judge, I can't deny that there is completely

7    inappropriate behavior and action on his part in reaching

8    out and sending money to a minor, but as The Court pointed

9    out, I don't see, and there is no allegation that there

10   was anything in this that was illegal.  I don't know how

11   that, why that would justify going above the guidelines.

12   So what I am saying is that all of these arguments I am

13   hearing from the government essentially it's the fact is

14   the facts, is the facts.  But I haven't heard, why it is

15   that the guidelines haven't taken that into consideration.

16       THE COURT:  Well, I think what he is saying is that

17   this case is an unusual amalgam of crimes that takes it

18   beyond what we ordinarily see in these kind of cases.

19       MR. TOWNSEND:  I don't disagree.  But, isn't every

20   single case when we get to counting units, isn't that the

21   situation?

22       THE COURT:  Well --

23       MR. TOWNSEND:  Well, if you have a fraud -- it is

24   because of the sentencing guidelines range for the child

25   pornography.  That is what it is.  That is what makes the

1   difference.

2        THE COURT:  Well, I mean, I think that his point

3   is -- where the government is coming from on this, the

4   variance, is that not only you have three different crimes

5   but three kinds of crimes.  You have got this fraud on

6   government with the false billings and trying to hide the

7   money and telling his lawyers, or telling accountants to

8   file a cash payment.  And then you have got all of this

9   stuff where he is trying to get involved in the intimate

10  lives of a minor, sending a sexual toy to a child that is

11  under the age of 18.

12       It is just bad stuff.

13       MR. TOWNSEND:  I am not -- I not contending -- it is

14  not.  I agree.  I agree.  But my contention is that the

15  guideline range takes that into consideration.  I mean any

16  time that we are going to group offenses the reason that

17  it only goes up one offense level is because the child

18  pornography charge is so much more serious than the fraud

19  charge.

20       THE COURT:  Right.

21       MR. TOWNSEND:  Going back to my overview, you know,

22  we start the guidelines.  Government says higher, we say

23  lower.

24       Going to the lower side, Your Honor, there is a

25  number of different things.  And I think I have outlined

1    it in the sentencing position, but I noted there at the

2    time, but at the detention hearing the government

3    presented evidence in support of incarcerating Mr. Miller

4    waiting for trial because he was a healthy person.  He was

5    essentially bragging about that.  Kind of reminds me of

6    everybody that is involved in a marathon.  You write the

7    thing up, you want to brag how well you have done.  Same

8    sort of evidence.  That is what it was.  He has been

9    swimming, and so they used that because they have

10   everything, his whole life.  Everything.  They got that

11   and say he is healthy.  Well, he also had co-morbidities,

12   he is obese, has COPD, asthma, and we place him in a jail

13   where we know how COVID is passed.  Sure enough he gets

14   it.  And he spends 29 days in the hospital fighting for

15   his life.

16        When I spoke with Dr. Dudley on the phone he said, "I

17   am surprised he survived."

18        You know, he is laying in a hospital bed.  He was --

19   he told the nurse, I feel like I am drowning.  And how do

20   we reconcile that?  The courts, you know, the case I

21   cited, says, we can consider pretrial incarceration as of

22   the time of departure, that that means, a variance, and

23   and the facts of the case says somebody was in a Columbian

24   prison, and it wasn't that the person was tortured, it was

25   that the conditions in that prison were terrible.  Well, I

1    think Mr. Miller would trade that for what he went

2    through.  Three months after he is released from the

3    hospital he has 58 percent lung capacity.  They recommend

4    physical therapy for him.  He had one physical therapy

5    session.

6         THE COURT:  Why is he in a wheelchair?

7         MR. TOWNSEND:  It is not because he can't stand and

8    he can't walk, it is that he can't stand and he can't walk

9    for that long.  He can stand and walk.  But he just can't

10   do it for that long.  What happened was he was in a

11   hospital bed for about 29 days.  Your body atrophies, and

12   then he didn't get the physical therapy that was

13   recommended.  So he, you know -- they put him in medical

14   isolation.  Medical isolation is just a little cell like

15   what are you going to do to regain the strength?  You

16   know, it is not an exaggeration that he nearly died.  He

17   was -- he was -- the doctor had a discussion with him

18   about whether or not he would be intubated.  And we know

19   what happens then, the percentage of people intubated.

20   Fortunately he recovered.  The question is, how could you

21   reconcile this?  A number of people, just because they had

22   co-morbidity, and they have the risk of getting COVID were

23   released.  Not, you know, but some people were -- I cited

24   those cases -- and he contracted it.  How do you reconcile

25   that?  How do we -- how -- there has to be a human side.

1    If we are saying you are so dangerous that we are going to

2    incarcerate you waiting for trial.  And we are not going

3    to -- we haven't protected you because you get COVID.

4    There has to be -- he didn't want that.  He had gone the

5    amount of time during the pandemic out in the community

6    without getting COVID.  I think there has got to be a

7    human side.  Those 29 days, the time that he is, you know,

8    got up 58 percent lung capacity after three months.  He

9    was lower than that, like, you know, how do you reconcile

10   that?  How do we account for that?

11        There is also, you know, I think The Court has

12   recognized the difference between receipt of child

13   pornography and possession.  He pled guilty to receipt.

14   He played by the rules of the game.  He did.  He is going

15   to be sentenced under that, but the sentencing commission,

16   you know -- I have cited all of that.

17        THE COURT:  How do you possess it without receiving

18   it?  I would like to understand that, but I don't.

19        MR. TOWNSEND:  Judge, that is why, that is why the

20   sentencing commission a decade ago said that Congress

21   should quote, unquote, align the sentencing.

22        But regardless of that, you play by the game.  He

23   pled guilty to the receipt.  And, you know, it is kind of

24   a unique state of the law, and there is a difference in

25   the sentences.  So, what I am pointing out and asking for

1    is a lower sentence, is what he has gone through and cited

2    cases as how pretrial incarceration can justify a downward

3    variance.

4         What I am pointing out is what the sentencing

5    commission has said is an unusual state in sentencing.

6    And then also I pointed out that the average sentence in

7    non-production cases is lower than the low end of the

8    guidelines.  The child pornography, that is what is

9    driving the sentence here, Judge.  Rightly so.  I

10   understand that.

11        But, you know, where I kind of came up with the 60

12   months is that when you combine all of these things I

13   think realistically, you know, I have a differing view on

14   what sentence would have been if it was just fraud.  Let's

15   say three years.  That is kind of low end of what the

16   government said.  You add another two years to that.  I

17   think that takes into consideration the child pornography

18   given the fact of what he has gone through.  I don't

19   think -- I just don't understand how we cannot say that

20   when we incarcerate somebody, we haven't protected them,

21   they nearly died, that it is just day for day.  Sentence

22   should be day for day.  It is a different type of sentence

23   for him.  He already had it.

24        Judge, we can say that there is only 300 people in

25   the Bureau of Prisons right now that have, that have

1    COVID, but what we don't know, we don't know.  We are

2    finding more and more about the delta variant and how

3    people who have already been vaccinated can pass it.  You

4    know, he is not in a situation to survive this again.  He

5    is just not there.  He is just not there.  Hopefully he

6    would get to that point.  But there is no way that he is

7    there now to survive it.

8         So, Judge, I also, you know, pointed out the

9    testimony from Congress how the Bureau of Prisons has not

10   addressed some of the things that has caused the spread,

11   or allowed the spread of the corona virus.

12        Judge, seems like we are kind of making all our

13   arguments here.  I would like to say that he would ask The

14   Court to recommend that he be at Butner so he can have the

15   appropriate medical treatment.  I would ask The Court to

16   recommend that, also.  And I would ask The Court for the

17   downward variance.

18        THE COURT:  So he would prefer to be at a place with

19   a prison hospital, essentially, as opposed to being in

20   Petersburg?

21        MR. TOWNSEND:  He has told -- I can't tell you how

22   many times he has told me to make sure I ask The Court to

23   recommend he be at Butner.

24        THE COURT:  Okay.

25        All right.  Thank you.

1          MR. TOWNSEND:  Thank you.

2          THE COURT:  Mr. Miller?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  You have a chance now to address me, tell

5     me anything you want me to think about in sentencing you.

6          I will be happy to hear you at this time.

7          THE DEFENDANT:  Okay.

8          THE COURT:  Let's hear from Mr. Miller.  If you can

9     stand up and talk with me.  Go ahead.

10          THE DEFENDANT:  Thank you, Your Honor.

11          I stand before you today in judgment for my crimes.

12          In the eleven months since my incarceration I have

13     lost everything I ever valued; my loving wife of 22

14     years --

15          Sorry.

16          -- my three amazing kids, my life-long friends, my

17     business of 28 years, my freedom, and a year of my life,

18     Your Honor.  I contracted COVID 19 while in custody.  This

19     has left me with significant lung damage.  And being

20     confined, for now, at least, to a wheelchair.  Unable to

21     walk now for more than about a hundred feet.

22          It is difficult to stand for longer than about three

23     to five minutes to take a shower.

24          All of my hardships over the last eleven months has

25     opened my eyes to my crimes.  I built my 35-year career on

1    brutal honesty and unquestionable integrity.  And I am

2    embarrassed and ashamed for not being completely honest

3    with all the people affected by my actions.

4        Sorry.

5        As to count one, I am sorry I ever accepted money

6    from anyone.  I know those people depended on the money

7    and the return that was promised.  I know this comes as a

8    terrible loss to them, and their family.  Most of all I am

9    sorry for betraying everyone's trust.  I promise to work

10   hard upon my release and not rest until every one is

11   repaid.

12       With regard to count two, I violated my fiduciary

13   duty, responsibility to the prime contractors and to U.S.

14   government customers for not accurately reporting our

15   contract hours on invoices.  I could have and should have

16   applied for a variance and billed the time accurately.

17   For that I am terribly sorry.

18       THE COURT:  How will you bill accurately the time of

19   your custodian that you billed as the computer whiz?

20       THE DEFENDANT:  The custodian is a former Naval,

21   member of the U.S. Navy with experience using computer

22   systems aboard the ship that were working to support the

23   training systems for the U.S. military for that contract.

24   His resume was submitted to the prime contractor and to

25   the government, and was accepted by both.  His full

1    qualifications are not being provided so that you can make

2    a balanced decision in that.

3         THE COURT:  All right.

4         THE DEFENDANT:  As to count three, I violated my

5    sacred obligation to my wife and family and to my

6    community, as well as to the victims impacted the abuse.

7    I am embarrassed and ashamed.  Whatever positive

8    association I may have ever had with that content has been

9    replaced forever by the painful reality of incarceration

10   and having to fight for my life in the hospital with COVID

11   19.

12        Thankfully, the statistics are in my favor.

13   Recidivism rate for well educated white men over 50 years

14   of age on their first offense is around five percent even

15   after only brief periods of incarceration.  I am certain I

16   will never re-offend.  And as such I pose no current or

17   future threat to the community or to society.

18        To my wife, my family, my friends and community and

19   victims, I am sorry.

20        Your Honor, I am not the same person I was a year

21   ago.  That person died in December of 2020 when I was

22   fighting for my life with every breath in intensive care

23   for a month.

24        One night after a rapid decline in my condition a

25   nurse came in around 11:30 p.m. and asked me to sign a do

1   not resuscitate order.  I believe it was either Christmas

2   eve or the day before that.

3        She said, you have less than a 50 percent chance of

4   surviving the night.  The hospital is full.  We are short

5   staffed because of the holiday, and frankly we have other

6   patients who are more viable who need our help.  When I

7   refused to sign the DNR, she says, it don't matter if you

8   sign or not.  We are so busy we won't be able to respond

9   any way.

10       I am sorry.

11       That night, Your Honor, I came to grips with the

12   reality that I would likely die.  Asking for grace and

13   mercy to forgive my sins.  I went to sleep that night and

14   fully accepted the fact I would not wake up.

15       That night the person I used to be died.

16       The nurse didn't come in at 4:30 a.m. to draw blood

17   or administer medication.  She simply expected me to die.

18   I woke up around 7:30 a.m.  The nurse came in a few

19   minutes later and seemed shocked that I was alive.  I woke

20   up that day and every day since simply grateful to be

21   alive.

22       When I was arrested I had taken everyone and

23   everything in my life for granted.  I was not humble or

24   grateful.  It wasn't was until I almost lost my life.  I

25   now I am filled with purpose.

1       Sorry, Your Honor.

2       Respecting amazing gift that every day is.  That

3   said, I live every day with a constant fear that if I get

4   COVID again I will most likely die.  The stress of

5   incarceration is hard enough on inmates but the last eight

6   months I have been confined to a wheelchair repeatedly

7   exposed to the risk of re-infection with increasing mor

8   contagious and more deadly COVID which caused so much

9   immense fear, my only other alternative is medical

10  isolation where I have already spent six weeks.  No human

11  contact.  Just four walls, seven foot by ten foot cell

12  that never gets cleaned.  Where it took more than an hour

13  of planning to make it three feet from the bed to the

14  toilet.  And and another hour to gather up enough strength

15  to make my way back.  I was pulled from the hospital

16  early.

17      In closing, Your Honor, I know God gives us no burden

18  greater than we can bear.  And that there is a penalty for

19  straying off the path of righteousness.  For the last

20  eleven months I have learned patient perseverance.  I have

21  also learned true humility and genuine gratitude,

22  something that I professed to know previously, but now

23  know intimately.

24      I knew from the first day I appeared in your

25  courtroom, Your Honor, that you had an unwavering

1    dedication for pursuit of justice.  Whatever sentence you

2    make in this regard I am merely grateful for my life and

3    for an opportunity of redemption.  And I ask The Court for

4    grace and mercy on this, my first offense, and ask you to

5    impose a sentence no greater than the mandatory minimum of

6    five years and consider Butner so that I can get the

7    medical attention and physical therapy that I so

8    desperately need.

9         Thank you, Your Honor.

10        THE COURT:  Thank up.  You may be seated.

11        All right.  Let's look at the 3553(a) factors.  This

12   is a case where I have to do an assessment for the victims

13   of the child sex.

14        MR. ELLIKER:  Yes, Your Honor.  I am glad you

15   mentioned that.  I forget.  I handed Ms Fish a consent

16   order of forfeiture.

17        THE COURT:  I have got the forfeiture?  Also

18   restitution order.

19        THE COURT:  Restitution.

20        MR. ELLIKER:  If you look at the attachment on the

21   restitution order, it includes victims of the fraud scheme

22   as well as the identified victims who have actual

23   retribution under the child pornography statute.

24        THE COURT:  Okay.  But there is some assessment that

25   I have to do in some cases in child porn cases for,

1    maybe -- there it is, a trafficking case.  Well, you

2    haven't asked for it, so we don't have to worry about it.

3    Okay.  Thank you.

4           All right.

5           So the nature and circumstances of the offense are --

6    did you have something to say about that?

7           MR. TOWNSEND:  No, sir.

8           THE COURT:  Okay.

9           MR. TOWNSEND:  Just standing.

10          THE COURT:  Nature and circumstances of the offense

11   in this case are essentially -- and this boils down to a

12   fairly complex scheme.  He stole money from investors.  He

13   stole money from the government.  He tried to hide it.  He

14   collected child pornography.  And he contacted children

15   and gave them money for, apparently, future favors.

16          The history and characteristics of the defendant are

17   that he does not have a criminal history.  Personally, he

18   was raised in pretty good circumstances.  His father

19   was -- drank excessively, and he was abusive for a while,

20   but later straightened out and took him in and had a

21   business of his own.  He, you know, Mr. Miller was able to

22   go to college and to graduate school at Virginia Tech.  He

23   was able to go to St. Christopher's, a good private school

24   here in Richmond.

25          As far as family goes, he has been married.  He has

1    three children.  Physical condition is, obviously he has

2    had problems with COVID.  And he doesn't have a substance

3    abuse problem.

4         Educationally he has a masters degree.  That is

5    pretty much his back ground.

6         He has been employed for apparently all his adult

7    life in various businesses.

8         The next factor is need for the sentence to reflect

9    the seriousness of the offense.

10        Well, its very serious.  Mr. Miller has been a

11   one-man crime spree.  He doesn't differentiate between

12   individual defendants, and the biggest defendant possible,

13   the U.S. Government.

14        He doesn't -- all of the apologizing today we didn't

15   hear anything about the little girl he sent a vibrator to.

16   All we heard more about his, how difficult prison is for

17   him than how difficult life is for the victims.  This is a

18   person who has mistreated family members, mistreated

19   people he dealt with in business.  It is an unusual

20   combination of crimes that he has committed.

21        The next factor is the need to promote respect for

22   the law.  Well, once he started down the road to crime he

23   showed none.

24        The next factor is the need to provide just

25   punishment.  Just punishment here is I think a serious and

1    weighty sentence.

2         The next factor is the need to afford adequate

3    deterrence.  I am always amazed that people are not

4    deterred from collecting child pornography given that we

5    give out long sentences for it all the time.  They are, as

6    Mr. Townsend describes, draconian.  And yet people

7    continue to do it.

8         So I am not sure that whatever we do today will deter

9    people from committing child pornography crimes.  I hope,

10   however, that it will deter people from committing white

11   collar crimes.  People who understand what is going on can

12   read the papers and look at what happened in court and can

13   make rational decisions whether to engage.  I hope it

14   deters future white collar crimes.

15        Next is the need to protect the public from further

16   crimes of the defendant.  I have got to say if there is a

17   single factor in this case that is more important than the

18   others it is that he is a man who is in his 50s, mid 50s,

19   who will eventually get out and be able to function in

20   society, and the shorter the sentence the sooner he can

21   get back to doing what he did in this case.  Protecting

22   the public from Mr. Miller is crucial in this case.

23        The next factor is to give him education, vocational

24   training, medical care and other treatment.  I think the

25   correctional system does have a good medical system.  I

1  don't think he needs anything else.

2       Next is the kinds of sentences available.  Counts one

3  and three there is a maximum of 20 years; count two is ten

4  year max; count three is five year mandatory minimum.  I

5  can fine him $250,000 on each of them.  I will not impose

6  a fine in this case because, obviously, he can't pay it.

7       The next factor is the need to take into account the

8  guidelines of 108 to 135 months.  I can take that into

9  account.  I thought about those.

10       The next factor is the need to avoid sentencing

11  disparity among similarly situated defendants.  I have

12  never had anybody like this, so there will be no

13  disparity.

14       There is an order of restitution that will be entered

15  in this case.

16       There is a motion for a variance based essentially by

17  the defendant on his health.  I will tell you this.  I

18  noticed something very interesting today about Mr. Miller.

19  When he was explaining how contrite he was about his

20  situation he patented, he paused, he cried.  When he was

21  explaining why the custodian he enlisted in his plan was

22  actually skilled in computer science he was articulate,

23  well spoken, quickly spoken, with no pauses, no deep

24  breaths, and it just caused -- I candidly don't think that

25  this man has an ounce of contrition.  And it made me

1    wonder about the seriousness of his health.  I will accept

2    that Mr. Miller has had COVID, that he lost lung capacity,

3    and I am sorry for him and the thousands of other

4    Americans who suffered from COVID.  I think that prison

5    system can take care of that.

6         There is a motion for a variance by the government

7    essentially based on the gross nature of the crimes and

8    their combination and his extraordinarily bad character.

9    I will say that it is combination of offenses.  If the

10   government asked for more, I would have given him up to

11   the maximum of 20 years.

12        All right.

13        The amount of restitution in this case is

14   $1,146,560.32.  I am not going to impose interest on that.

15   I will waive it.  I will impose a restitution order today

16   to that effect.

17        There is also an order of forfeiture here for all the

18   various electronic equipment that he had, that he used on

19   this pornographic escapades.

20        I will enter that.

21        All right.

22        Mr. Miller, please stand up.

23        You can stay seated.  I know you are having trouble.

24        THE DEFENDANT:  Is it okay if I stand, Your Honor?

25        THE COURT:  You can stand or sit.

1           Pursuant to the factors set forth in section 3553(a)

2    and the Sentencing Reform Act of 1984, and having

3    considered the Federal Sentencing Guidelines as advisory,

4    it is the judgment of The Court that you are hereby

5    committed to the custody of the U S Bureau of Prisons to

6    be imprisoned for a term of 151 months, with credit for

7    time served.  This consists of 151 months on count one and

8    count three; and 120 months on count two; all to be served

9    consecutively.  This sentence is sufficient but does not

10   exceed amount of time necessary to achieve the goals of

11   sentencing as set forth in 18 U S code section 3553; it

12   reflects the seriousness of the offense, promotes respect

13   for the law, provides just punishment for the offense, and

14   protects the public from further crimes that you may

15   commit.  I recommend that the Bureau of Prisons assign you

16   to the facility in Butner, North Carolina, or to another

17   facility which has a prison hospital associated with it.

18          Upon release from imprisonment you will be placed on

19   supervised release for a term of life on count three, and

20   for three years on count one and two to be served

21   concurrently.  So when you get out you have to report to

22   the probation office in the district in which you are

23   released.  While on supervised release you will not commit

24   any federal, state, or local crimes.  You will not

25   unlawfully possess a controlled substance. You will not

1    possess a firearm or destructive device.  You will comply

2    with the standard conditions of supervised release as

3    recommended by the U.S. Sentencing Commission.

4         Mr. Townsend, did you go over those?  They are in the

5    presentence report.

6         MR. TOWNSEND:  The supervised release?  Yes, sir.

7         THE COURT:  Good.  Thank you.

8         You can not open credit cards or lines of credit

9    without the approval of your probation officer.  You will

10   provide the probation officer access to any requested

11   financial information.

12        All right.

13        I have considered your net worth and liquid assets,

14   your life style and financial needs as reflected in the

15   presentence report, your earning potential and the

16   dependents relying on your support and find you are not

17   capable of paying a fine.  No fine will be imposed.  But

18   as to count one, two and three you will pay a special

19   assessment in the amount of a hundred dollars each.  If

20   you have not already done so, the total special assessment

21   is $300.  It is due in full immediately.  Any unpaid

22   balance will have to be paid when you start supervised

23   release in installments of not less than ten dollars per

24   month until paid in full.  Those will start 60 days after

25   your supervised release begins to allow you to get your

44

1   feet on the ground.  Payment of any unpaid balance is a
2   special condition of your supervised release.  Any
3   forfeiture previously entered is hereby made a part of the
4   sentence and included in the judgment.
5           You have 14 days to appeal this to the U.S. Court of
6   Appeals for the Fourth Circuit.  You don't have to pay
7   money to do that.  Mr. Townsend will file the appropriate
8   papers if you ask him.
9           Anything else, Mr. Elliker?
10          MR. ELLIKER:  Your Honor, you the government moves to
11   dismiss the indictment underlying this case at the outset,
12   and also in the related child pornography case.
13          THE COURT:  All right.  That motion is granted.
14          Anything else, Mr. Townsend?
15          MR. TOWNSEND:  Nothing.
16          THE COURT:  All right.
17          Let me thank all the people who came today.
18          Mr. Miller, you are remanded to the custody of the
19   Marshal.
20          Did I say he gets credit for time served?
21          MR. TOWNSEND:  You did.
22          THE COURT:  I did?
23          MR. ELLIKER:  You did say that, yes.
24          THE COURT:  All right.
25          You are remanded to the custody of the Marshal.

1          Mr. Miller, sir, good luck, and God bless you.

2          THE DEFENDANT:  Thank you, Your Honor.

3          THE COURT:  Let's adjourn court.

4          Let me see counsel back in chambers after you get a

5     chance to take care of whatever you have to take care of

6     out here.  I want to talk to you about something

7     unrelated.

8          Thank all very much.

9                         HEARING ADJOURNED

10         Certified true and correct transcript.

11              Gilbert F. Halasz, OCR
                Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25