IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v. Criminal Action No. 3:20-cr-109

GORDON G. MILLER, III,
Defendant.

# OPINION

On February 6, 2021, Gordon G. Miller, III, pleaded guilty to fraud, money laundering, and receipt of child pornography. He has now filed several *pro se* motions seeking to undermine the validity of his plea due to several alleged government conspiracies.

The Court, however, finds no reason to disturb Miller's admissions. First, the Court will deny Miller's motion for recusal because the undersigned judge can fairly and impartially decide the remaining motions. (ECF No. 92.) Next, the Court cannot take the government's failure to respond timely as acquiescence to Miller's claims for the simple fact that the government responded timely. (ECF Nos. 102, 105.)

Turning to the substance of Miller's claims, the Court will deny his motion to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255. (ECF No. 86.) Miller offers four grounds for relief: (1) Three attorneys failed to effectively assist him; (2) he did not knowingly and voluntarily plead guilty; (3) he is actually innocent of the alleged crimes; and (4) the government committed prosecutorial misconduct by engaging in several conspiracies against him. None of these fantastical allegations support Miller's motion. They either contradict his sworn statements during his plea colloquy, or they did not reasonably cause Miller to plead guilty in the first place.

Finally, the Court will deny three other pending motions because Miller has offered palpably incredible allegations of a vast government conspiracy. (ECF Nos. 91, 93, 114.)

## I. BACKGROUND

### *A. Factual Background*

For nearly three years, Miller engaged in overlapping financial schemes to keep two businesses afloat. When police began investigating these fiscal crimes, they uncovered a trove of child pornography on Miller's electronic devices. Because he now asserts his actual innocence of these crimes, the Court finds it proper to detail the facts to which Miller admitted during his guilty plea hearing. (ECF No. 31.)

By 2016, Miller solely owned and operated two companies—G3 Systems, Inc., and G3i Ventures, LLC. (*Id.* ¶ 1.) That year, he joined an online forum called Quora.com, where he embellished his credentials as a successful investor and entrepreneur. (*Id.* ¶¶ 5–6.) Using this forum, Miller sought people to participate in a "private debt instrument program" through G3i Ventures. (*Id.* ¶ 7.) He promised these people that, among other things, their money would help expand his businesses and that investors could see returns of "approximately 18 percent." (*Id.*) By 2018, at least ten individuals had signed promissory notes and "transferred their money" to Miller. (*Id.* ¶¶ 8–9.)

Initially, Miller made interest and principal payments to some. (*Id.* ¶ 10.) But in March 2018, he offered a "50 percent" rate of return to those who reinvested their interest and principal in a new project. (*Id.*) Most investors accepted these terms and signed new promissory notes set to mature on July 1, 2019. (*Id.* ¶ 11.) Miller, however, used the money for purposes other than what he promised. (*Id.* ¶ 10.)

Despite the ongoing Quora scheme, by July 16, 2018, both the Internal Revenue Service and Virginia's Department of Taxation informed Miller that he had large sums of unpaid federal and state taxes. (*Id.* ¶¶ 24, 25.) Miller then began a money laundering scheme, seemingly separate from his investment fraud. Earlier in 2018, Miller helped a company he did not own ("Company 1") secure a subcontract tied to a project for the U.S. Army. (*Id.* ¶ 15.) On July 25, 2018, Miller emailed the owner of Company 1 that Miller's businesses—G3 Systems and G3i Ventures—could no longer assist with the subcontract because they would soon close. (*Id.* ¶ 17.) The next day, Miller informed the prime contractor that G3 Systems, *not* Company 1, would complete the subcontract work. (*Id.* ¶ 18.) In essence, Miller diverted subcontract work from Company 1 to his own business. (*See id.*)

The subcontract required Miller "to submit monthly invoices for time and materials spent on the work." (*Id.* ¶ 20.) For months, Miller submitted invoices billing over $300,000 for work that G3 Systems employees, including Miller, purportedly did. (*Id.*) These employees, however, did less work on the project than Miller billed for. (*Id.* ¶ 22.) Still, the prime contractor sent money to G3 Systems, including at least one $49,008.96 check. (*Id.* ¶ 21.) From fall 2018 through summer 2019, Miller cashed these checks through a business in Richmond, Virginia. (*Id.* ¶ 29.)

On July 1, 2019, the promissory notes for investors in the Quora scheme matured. (*See id.* ¶¶ 11, 12.) But Miller did not pay. (*Id.*) Instead, he emailed the noteholders to propose a further extension of the maturity date and to advise against "hasty legal action." (*Id.* ¶ 12.) Although Miller represented that the money went to business projects, he used the majority of at least one person's payment "for personal purposes, including paying [Miller's] own living expenses." (*Id.* ¶ 14.)

By June 2020, the federal government had started investigating Miller. Law enforcement obtained a warrant to seize from Miller's home certain items used in his financial crimes. (*Id.* ¶ 32.) In reviewing a seized hard drive, the Federal Bureau of Investigation ("FBI") stumbled upon child pornography. (*Id.* ¶ 34.) A subsequent search and seizure of Miller's belongings revealed that he had sixteen devices containing "more than 700 images or videos constituting child pornography." (*Id.* ¶ 38.) At least one of the videos depicted an adult having sex with a prepubescent female. (*Id.* ¶ 40.)

***B. Procedural History***

Miller knew federal authorities were investigating his crimes as early as December 2019, when he received a target letter from the FBI. (ECF No. 103-1.) In response to this letter, then-United States Magistrate Judge Roderick C. Young appointed a federal public defender, Nia Vidal, Esq., as Miller's counsel. In August 2020, before the government filed any charging instrument in this case, Vidal informed Miller that she had applied for a position in the U.S. Attorney's Office, and Miller consented to keeping Vidal as his lawyer. (*See* ECF No. 103-3.) Vidal did not get the job.

On September 9, 2020, the government filed a criminal complaint against Miller regarding his possession of child pornography. *See* Compl., *United States v. Miller*, 3:20cr116 (E.D. Va. 2020), ECF No. 1. Miller was arrested on September 10, 2020, and temporarily held until his detention hearing on September 16, 2020. *See* Min. Entries, *Miller*, 3:20cr116 (E.D. Va. 2020), ECF Nos. 6, 8. During this six-day period, Vidal did not speak directly with Miller.[1] Miller and

[1] Vidal reports that she attempted to meet with Miller on a video call, but as often happened during the height of the COVID-19 pandemic, the jail never produced Miller for the call. (ECF No. 103 ¶ 8.)

Vidal, however, did speak before the detention hearing. (*See* ECF No. 94, at 37.) At this time, she reviewed newly received evidence with Miller.

On October 7, 2020, a grand jury charged Miller with eight counts relating to his financial schemes. (ECF No. 1.) On October 13, 2020, Vidal's supervisor, Robert Wagner, Esq., moved to withdraw the whole Office of Federal Public Defender as counsel due to a conflict of interest between Miller and the office. (ECF No. 3.) After a hearing, the Court permitted the withdrawal and appointed George Townsend IV, Esq., as new defense counsel. (ECF No. 5.)

On February 9, 2021, the government filed a criminal information relating to both Miller's financial crimes and his receipt of child pornography. (ECF No. 22.) This information charged one count of wire fraud, in violation of 18 U.S.C. § 1343; one count of engaging in an unlawful monetary transaction, in violation of 18 U.S.C. § 1957; and one count of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A). (*Id.*)

On February 16, 2021, Miller pleaded guilty to the allegations in the criminal information. In anticipation of Miller's plea, the parties submitted a statement of facts, signed by Miller, which outlined the factual basis for the plea. (ECF No. 31.) At the plea hearing, the Court asked Miller a series of questions pursuant to Federal Rule of Criminal Procedure 11. Relevant portions of that colloquy appear below:

> THE COURT: And are you fully satisfied with the services and advice that has been provided to you by Mr. Townsend in this case?
>
> THE DEFENDANT: I am, Your Honor. He is an excellent attorney.
>
> THE COURT: That is why we appointed him.
>
> THE DEFENDANT: I thank you for that, too, sir.
>
> THE COURT: Is there anything that you asked Mr. Townsend to do that he would do for you?

THE DEFENDANT: I am not sure. I don't know that he would support that, but to my knowledge there is nothing, yes.

THE COURT: Let's just break it down. Is there anything that you asked him to do that he declined to do?

THE DEFENDANT: No, sir. No. He never declined to do anything, whether he—

THE COURT: Did you have any questions that he refused to answer?

THE DEFENDANT: No, sir. Not at all. . . .

THE COURT: Okay.

Now, there is also here a statement of facts, which is 12 pages long and appears to have your signature on the last page.

Did you sign that?

THE DEFENDANT: Yes, Your Honor, I did.

THE COURT: Did you read it before you signed it?

THE DEFENDANT: Yes, Your Honor, I did.

THE COURT: Did you go over it with Mr. Townsend?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did he explain it to you?

THE DEFENDANT: He did.

THE COURT: If you had questions did you ask them, and did he answer them?

THE DEFENDANT: Yes, Your Honor, he did.

THE COURT: So what this says, it is really quite long, is that you essentially mislead some people in various ways into giving you some money, and that you used wire communications to do that. And it says that when you got the money from one source you moved it into another source so that is what is call[ed] money laundering. And then it says that when the police came to your house they found some computers, and that they found on one or more of those computers some child pornography. Is that all that true?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is there anything false in the statement of facts?

THE DEFENDANT: No, Your Honor, there is not.

THE COURT: Are you pleading guilty because you are in fact guilty of these offenses?

THE DEFENDANT: I am pleading because I am guilty, Your Honor. . . .

THE COURT: Now, does the plea agreement that we talked about a second ago, does that reflect the agreement treatment [*sic*] that you have with the prosecution? In other words, do you have any side deals?

THE DEFENDANT: That is the complete agreement we have with the government.

THE COURT: Other than the one we just talked about, and the other things that are in the plea agreement, are there any other promises that were made to you in order to get you to plead guilty today?

THE DEFENDANT: There is [*sic*] no other promises, Your Honor.

THE COURT: Has anybody made any threats against you other than the threat they would continue to prosecute you?

THE DEFENDANT: No, Your Honor. No threats.

THE COURT: Has anybody other than the government made any threats against you? Anybody threatened you from any -- the street or anything, or anything about that?

THE DEFENDANT: No, Your Honor. I have received no threats.

THE COURT: Okay. How about any threats to members of your family?

THE DEFENDANT: No, sir. . . .

THE COURT: Now, turning to the receipt of child pornography. The government has to prove [] that first of all that you received this kind of pornography with intent to view it. That you knew it was child pornography. That it was in fact child pornography. And that you used some means to get it that was in or affecting interstate or foreign commerce. Do you agree the government could prove each of these facts?

THE DEFENDANT: Yes, Your Honor.

(ECF No. 106, at 14–35.)

The Court adjudicated Miller guilty. On August 6, 2021, the Court sentenced the defendant to 151 months' imprisonment and a lifetime of supervised release. (ECF No. 49, at 1–3.)

Since that time, Miller has filed various motions seeking relief from his convictions and sentence. (ECF No. 56, 78–83.) In response to these filings, the Court directed the Clerk's Office to send Miller a 28 U.S.C. § 2255 form on September 24, 2024. (ECF No. 85.)

On February 5, 2025, Miller filed the instant § 2255 motion and an accompanying memorandum. (ECF No. 86, 94.) He also filed a motion for the undersigned to recuse himself, (ECF No. 92); a motion for emergency injunctive relief, (ECF No. 91); and a request for an evidentiary hearing, (ECF No. 93).

On March 11, 2025, United States Magistrate Judge Mark R. Colombell declined to appoint counsel for Miller, but directed the government to respond in 60 days. (ECF No. 96.) On April 16, 2025, the government moved for an extension of time to file its responsive brief and accompanying affidavits. (ECF No. 99.) The Court granted that motion and directed Miller's former attorneys to file affidavits discussing Miller's allegations of ineffective assistance of counsel. (ECF No. 100, at 1–2.) The Court also ordered the government to respond to Miller's § 2255 motion thirty days *after* the filing of the last affidavit. (*Id.* at 2.)

While the government awaited the affidavits, Miller filed two motions asking the Court to find in his favor because the United States had yet to respond. (ECF No. 102, 105.) The final affidavit from one of Miller's lawyers came on July 10, 2025, and the government timely responded to the § 2255 motion on August 7, 2025—twenty-eight days after the filing of the last affidavit. (ECF Nos. 107, 108.) Since then, Miller filed two motions to supplement the record, (ECF Nos. 111, 112), and another motion for emergency injunctive relief, (ECF No. 114.)

## II. MOTION TO RECUSE

The Court will first address Miller's motion for recusal pursuant to 28 U.S.C. § 144. Under that statute, a judge must stop presiding over a case "[w]henever a party . . . files a timely and sufficient affidavit that the judge . . . has a personal bias or prejudice either against [the party] or in favor of any adverse party." 28 U.S.C. § 144.

Courts use two different standards to assess bias under § 144. Under the first, a judge must recuse when he or she exhibits the same level of bias as required to recuse under 28 U.S.C. § 455. *See Jones v. United States*, No. 2:05cv264, 2005 WL 2086196, at *2 (E.D. Va. Aug. 29, 2005) (citing *Liteky v. United States*, 510 U.S. 540, 548 (1994)). According to § 455, a judge must recuse "if a reasonable factual basis exists for doubting the judge's impartiality. The inquiry is whether a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial." *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003) (citation omitted). This standard requires recusal for a broader range of conduct than the second standard courts apply to § 144. Under the second standard, "a motion to disqualify requires a showing of *actual bias*." *United States v. Farkas*, 149 F. Supp. 3d 685, 693 (E.D. Va. 2016) (quoting *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 718 (7th Cir. 2004) (emphasis in original)). Because a reasonable person would find actual bias raises doubts about a judge's impartiality, disqualifying conduct under the second standard would also disqualify a judge under the first standard. *See id.* ("Therefore § 455(a) is inclusive of, but not coextensive with, the actual personal bias or prejudice necessitated under § 144.")

"Because § 455(a) encompasses § 144 and the Court is required to liberally construe a pro se plaintiff's claims," this Court will analyze Miller's motion under "the broader standard set forth

in § 455(a)." *Chien v. Leclair*, No. 3:19cv814, 2021 WL 12324376, at *2 (E.D. Va. Sept. 10, 2021).

Miller offers evidence that he believes shows "significant probability of actual bias." (ECF No. 92, at 2.) First, he contends that the undersigned said at sentencing, "Mr. Miller, you should be grateful that the government is only seeking twelve and a half years. If it were up to me, I would have given you twenty." (*Id.*) Even if the undersigned spoke those exact words to Miller,[2] they offer no reasonable basis for doubting the undersigned's objectivity. The remarks would simply reflect the Court's belief, derived from the evidence presented in this case and the applicable law, that Miller engaged in serious criminal activity requiring appropriate punishment. Such "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the proceedings . . . almost 'never constitute a valid basis for a bias or partiality motion.'" *Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011) (citation omitted). Further, the undersigned ultimately sentenced Miller to 151 months' imprisonment—far below the statutory maximum—demonstrating the ability to separate any potential personal thoughts from legal rulings.

Second, Miller argues the undersigned showed bias by denying Miller's prior motions alleging a government conspiracy coerced him into pleading guilty. These denials allegedly gave

---

[2] (*Id.*) The sentencing transcript does not contain that exact statement. Rather, the transcript reflects that the undersigned, in outlining the parties' positions, stated,

> There is a motion for a variance by the government essentially based on the gross nature of the crimes and their combination and his extraordinary bad character. I will say that it is combination of offenses. If the government asked for more, I would have given him up to the maximum of twenty years.

(ECF No. 51, at 41.)

the government further time to plot and destroy evidence, among other things.[3] But "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion . . . unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. Here, the undersigned's rulings do not display any spite or favor. The Court simply applied the law as it saw right. Further, Miller points to no statements accompanying these rulings that reflect undue prejudice. Lastly, as explained below, Miller offers no credible evidence of a conspiracy against him. Accordingly, Miller's second argument for recusal fails.

Third, Miller believes the undersigned has political bias against him because Miller associates with the Republican Party and the undersigned was appointed by President Barack Obama.[4] Aside from the undersigned's appointment, Miller offers nothing else to suggest that a political bias exists or that such a bias informed any ruling against him. And an appointing president's political party, or even the former political associations of the judge, cannot provide a

---

[3] Miller also says that the Court's decisions violated certain American Bar Association Model Rules of Professional Conduct. The Rules cited—Model Rules 1.1 and 3.8—describe only standards for practicing attorneys, not judges. Accordingly, the Court offers no extended analysis on this allegation.

[4] (ECF No. 92, at 4.) Miller contends that the undersigned has a "*stated* political bias" due to comments in another case entirely unrelated to Miller's. (*Id.* (emphasis added).) Upon reviewing the record in that case, the Court finds only one reference it made to the former President. After the Court held a side-bar during trial, the undersigned commented to the courtroom:

> What you have just seen is something that surprised me when I became a judge. I always thought when President Obama appointed me as a federal judge, people would do things, and things would move along quickly, and I would be in charge of everything. But what you will see is I'm not in charge of much of anything.

Transcript, *United States v. Bourabah*, No. 2:23cr37, (E.D. Va. July 19, 2024), ECF No. 102, at 54. This statement does not reflect, in any way, a bias in favor of any political cause, candidate, or figure.

basis for recusal alone. *See Taitz v. Colvin*, Civil Action No. ELH-13-1878, 2014 WL 3739542, at *3 (D. Md. July 25, 2014). Judges routinely make rulings adverse to their potential political preferences. Indeed, many judges have ruled against the very president who nominated them or "the political party with which they may have once been aligned."[5] Miller, therefore, provides no reasonable basis to question the undersigned's political impartiality in the discharge of his duties.

Finally, in two supplemental filings, Miller asks the Court to accept a news article discussing the undersigned as an exhibit supporting his motion.[6] Miller does not clearly explain how the article supports his motion. Nevertheless, the Court has read it and finds nothing in it to question the Court's ability to remain impartial to Miller. The article simply addresses the undersigned's career, life, and personal background; it does not suggest any personal animus or prejudice toward Miller.

Accordingly, the Court will deny the motion for recusal. (ECF No. 92.)

## III. <u>MOTIONS FOR GOVERNMENT'S ALLEGED FAILURE TO RESPOND</u>

Having determined that it may continue to preside over this matter, the Court now addresses two pending procedural motions. Although the government initially had to respond to the § 2255 motion by May 10, 2025, the Court granted an extension. (ECF No. 100.) Nevertheless, when the original deadline passed with the government's response, Miller filed two motions. In a motion for a writ of mandamus and certificate of appealability, Miller asks the Court to direct the government's response or take the government's silence as acceptance of Miller's allegations.

---

[5] *Id.*; *see also In re Exec. Off. of the President*, 215 F.3d 25, 25–26 (D.C. Cir. 2000) (listing cases in which judges have ruled against their appointing president).

[6] (ECF Nos. 111, 112.) The Court will grant these motions to the extent that they ask the Court to consider the article as an exhibit to the motion for recusal. The Court, however, grants no other relief possibly asked for in those motions.

(ECF No. 102.) In an emergency motion for immediate release, Miller again asks the Court to take the government's silence as acceptance and to "overturn his conviction and provide an order for his immediate release." (ECF No. 105.)

The Court will not grant these motions. (ECF Nos. 102, 105.) As explained, and as directed by the Court, the government responded within thirty days after Miller's lawyers entered their affidavits. (*See* ECF Nos. 107, 108.) Accordingly, the government did not fail to respond timely, and Miller's motions have no basis.

## IV. **SECTION 2255 MOTION**

The Court now turns to the substance of Miller's § 2255 motion. Section 2255 gives a federal prisoner means to "vacate, set aside[,] or correct" his sentence or conviction. 28 U.S.C. § 2255(a). To receive such relief, the prisoner must prove by preponderance of the evidence that the sentence or conviction (1) violated the Constitution or laws of the United States, (2) was imposed by a court lacking jurisdiction, (3) exceeds "the maximum authorized by law," or (4) is "otherwise subject to collateral attack."[7] Generally, the Court need not consider arguments adjudicated or forfeited on direct appeal. *Bousley v. United States*, 523 U.S. 614, 621–22 (1998). Nevertheless, courts may still consider claims of actual innocence or ineffective assistance of counsel.[8]

Miller makes four main arguments.[9] First, he claims that three attorneys ineffectively assisted him. Further, he claims that he did not make a knowing and voluntary guilty plea. He

[7] *Id.*; *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958) (citations omitted).

[8] *Id.* at 623–24 (actual innocence); *Massaro v. United States*, 538 U.S. 500, 504 (2003) (ineffective assistance).

[9] The Court does not address these arguments in the order they appear in Miller's motion, in part because Miller contends that "it is first necessary to determine if [he] was denied effective assistance of counsel." (ECF No. 94, at 31.)

also asserts his actual innocence of the crimes to which he pleaded guilty. Finally, Miller claims that overlapping government conspiracies gave rise to prosecutorial misconduct.

As explained below, none of Miller's arguments succeed.

### *A. Ineffective Assistance of Counsel*

Miller claims three attorneys—Nia Vidal; Robert Wagner; and George Townsend, IV—failed to effectively assist him. His allegations fail either because the purported misconduct did not prejudice him or because they contradict his valid Rule 11 colloquy. Accordingly, the Court will dismiss any claim of ineffective assistance of counsel.

#### *1. Legal Standard for Ineffective Assistance*[10]

Sometimes, a lawyer's performance falls so short that it violates a prisoner's Sixth Amendment right to counsel. *Strickland v. Washington*, 466 U.S. 668, 691–92 (1984). Such a constitutionally ineffective performance can support relief from a sentence or conviction under § 2255. *See United States v. Hadden*, 475 F.3d 652, 661 (4th Cir. 2007). To receive that relief, though, a convicted defendant must show (1) that "counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defendant." *Strickland*, 466 U.S. at 657. Courts

---

[10] Miller asks the Court to apply the ineffective assistance of counsel standard under *United States v. Cronic*, 466 U.S. 648 (1984). Pursuant to *Cronic*, courts must presume prejudice to a defendant when either (1) there is "complete denial of counsel," (2) "counsel entirely fails to subject the prosecution's case to meaningful testing," or (3) "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Id.* at 659–60.

None of these circumstances apply here. Miller admits each lawyer showed up for hearings and made at least some "cogent points." (ECF No. 94, at 58.) Accordingly, none of the lawyers made a "complete" "failure to test the prosecutor's case." *Bell v. Cone*, 535 U.S. 685, 697 (2002). In fairness, Miller identifies a six-day period between his arrest and detention hearing in which he could not speak to his lawyer. Nevertheless, Miller also admits that he got to speak briefly with his lawyer before the hearing and that she made arguments in his favor. (ECF No. 94, at 58.) Accordingly, the *Cronic* presumption of prejudice does not apply.

presume that a lawyer acted sufficiently, but a prisoner can rebut this presumption by showing that "'counsel's representation fell below an objective standard of reasonableness' measured by 'prevailing professional norms.'" *United States v. Conner*, 456 F. App'x 300, 304 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688). Still, a subpar performance without prejudice does not guarantee relief. A defendant must also prove prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. If a court finds that no prejudice exists, it need not even address whether counsel acted deficiently. *Id.* at 697.

In the context of guilty pleas, prejudice exists when "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). But a reasonable probability does "not necessarily" arise simply because Miller asserts he would not have pleaded guilty but for his counsel's performance. *See United States v. Mora-Gomez*, 875 F. Supp. 1208, 1214 (E.D. Va. 1995). Instead, a court must perform an "objective inquiry" and look to all facts surrounding the plea, including the likelihood of conviction and potential sentencing benefits. *Meyer v. Branker*, 506 F.3d 358, 368–69 (4th Cir. 2007) (citing *Hooper v. Garraghty,* 845 F.2d 471, 475 (4th Cir. 1988)).

When assessing these facts, the Court presumes the truth of representations made during the plea proceedings, "as well as any findings made by the judge accepting the plea." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). Given this presumption, "in the absence of extraordinary circumstances, allegations in a § 2255 motion that directly contradict the [defendant's] sworn statements made during a properly conducted Rule 11 colloquy are always palpably incredible and 'patently frivolous or false.'" *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005)

(citations omitted). Accordingly, "a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *Id.* at 221–22.

2. Discussion

*a. Nia Vidal*

Miller asserts that Nia Vidal committed a litany of errors that amounted to ineffective assistance. As explained above, Vidal represented Miller in the early stages of this case, from the time he received an FBI target letter through his indictment for financial fraud. He bemoans (1) Vidal's alleged conflict of interest with the U.S. Attorney's Office; (2) her lack of communication from the time of his arrest to his preliminary detention hearing; (3) her failure to review newly acquired evidence with him before the detention hearing; (4) her failure to file a motion to suppress based on police misconduct; and (5) her "final treacherous act" of not calling Miller's mother as a witness at the detention hearing. This final act, Miller says, led to his supposed death and eventual waking on Christmas day. (*Id.* at 64.)

To begin, none of Vidal's conduct fell "below an objective standard of reasonableness measured by prevailing professional norms." *Conner*, 456 F. App'x at 304 (cleaned up) (citation omitted). She procured Miller's consent to continue her representation, despite her application to work for the U.S. Attorney's Office. Moreover, lawyers frequently experienced continued communication delays with incarcerated clients during the COVID-19 pandemic, and Vidal still managed to speak with Miller and go over new evidence just before the hearing. Finally, lawyers retain much discretion to make tactical decisions "without the defendant's consent," "such as what evidence should be introduced . . . and what pre-trial motions should be filed." *United States v. Chapman*, 593 F.3d 365, 368 (4th Cir. 2010) (quoting *Sexton v. French*, 163 F.3d 847, 885 (4th

Cir. 1998)). Accordingly, Vidal could properly decline to file a motion to suppress or to call Miller's mother as a witness.

Even if Vidal acted beneath a lawyerly standard, Miller never shows that, but for her actions, he "would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Vidal's representation focused on early pretrial matters and ended months before the guilty plea. Further, as admitted during his Rule 11 colloquy, another attorney advised Miller regarding the plea, putting further distance between Vidal's actions and Miller's decision. Accordingly, the Court finds no "reasonable probability" that Vidal's conduct bore at all on Miller's choice to admit guilt. *Id.*

*b. Robert Wagner*

In a familiar refrain, Miller accuses another public defender, Robert Wagner, of failing to communicate with him or investigate FBI misconduct against him. (ECF No. 94, at 65–68.) But Miller's accusations against Wagner suffer from the same defects as appear in his claims against Vidal. Again, Miller offers no reason to believe that Wagner's actions had any bearing on the decision to plead guilty. Wagner assisted in this case[11] months before Miller decided to plead, and his representation appears confined only to Vidal's motion to withdraw as counsel. Accordingly, Miller again fails to show a "reasonable probability" that, but for counsel's actions, he would have insisted on going to trial.[12]

---

[11] To be clear, the United States disputes that Wagner even had an attorney-client relationship with Miller. At the time of the withdrawal motion, Wagner served as Vidal's supervisor.

[12] *Hill*, 474 U.S. at 59. To the extent Miller argues that the "collective and cumulative impact of ineffective assistance of counsel" persuaded him to plead guilty, this argument fails. (ECF No. 94, at 74.) As explained below, the Court's colloquy would have cured any defect in the lawyers' performance.

*c. George Townsend, IV*

Finally, Miller levies unfounded accusations against George Townsend, IV, the lawyer who represented him throughout his plea and sentencing. From the outset of their relationship, Miller apparently mistrusted Townsend because of the lawyer's background as "a former Assistant U.S. Attorney." (ECF No. 94, at 68.) According to Miller, Townsend declined to file a motion to suppress and failed to revisit the question of pretrial detention, despite the defendant's requests. (*Id.* at 68–69.) Further, Townsend, like the lawyers preceding him, allegedly failed to investigate the FBI's criminal conspiracy against Miller, despite Miller's providing video evidence. (*Id.* at 69.)

Miller also complains that Townsend ignored two lengthy documents from Miller asking his lawyer to take certain actions or heed particular evidence. (*Id.* at 70.) Further, when the government offered the plea deal that Miller took, Townsend apparently failed to explain the legal difference between receipt of child pornography and possession of child pornography.[13] Finally, after sentencing, Townsend allegedly threatened Miller after the defendant said he would file a § 2255 motion for Townsend's deficiencies.[14]

---

[13] (*Id.* at 71–73.) When making allegations against Townsend, Miller also makes two statements worth addressing. First, he wrongly claims that the government only charged him with receipt of child pornography because of one image a teenaged girl sent to him. (*Id.* at 72.) But the criminal information in the instant case clearly contradicts this and ties the receipt charge to, among other things, pictures of prepubescent minors Miller kept on his computer and at least one pornographic video of a child also stored on a hard drive. (ECF No. 22, at 4.) Second, Miller claims the government breached his plea agreement because they failed to move for a sentence reduction after he promised to cooperate with the government. (ECF No. 94, at 81.) The Court, however, finds no provision in the agreement requiring Miller to cooperate. (ECF No. 30.)

[14] This threat allegation fails to prove causation under *Strickland*. To receive relief, Miller must show that, but for counsel's deficiencies, he would have opted for trial. *Hill*, 474 U.S. at 59. Even if Townsend made these comments, a comment made after sentencing cannot have had any bearing on Miller's decision to plead guilty.

Most of Miller's allegations fail because his valid Rule 11 colloquy contradicts them. The bulk of Miller's gripes contend that Townsend failed to do what Miller asked of him: Townsend apparently did not investigate a supposed conspiracy, did not file a motion to suppress, did not read documents, and so on. But at the plea hearing, Miller said that Townsend "never declined to do anything" Miller asked and had never refused to answer a question. (ECF No. 106, at 15.) Indeed, Miller called his counsel "an excellent attorney." (*Id.* at 14.) Further, the colloquy cured any misunderstanding Miller may have had about the legal nature of receipt of child pornography.[15] The Court reviewed the elements of that crime with Miller, and Miller agreed that the government could prove that charge. (*Id.* at 35.) Miller's admission, therefore, contradicts his claims that he lacked an understanding of the receipt charge.

Accordingly, Miller's motion now relies on post-hoc "self serving assertion[s]," the very sort of allegations courts "subject to heavy skepticism." *Merzbacher v. Shearin*, 706 F.3d 356, 367 (4th Cir. 2013) (citation omitted). And when a movant offers such claims, the Court must "dismiss any § 2255 [claim] that necessarily relies on allegations that contradict the sworn statements." *Lemaster*, 403 F.3d at 221 (alteration added).

For these reasons, the Court will deny Miller's § 2255 motion as it relates to his three ineffective assistance of counsel claims.

***B. Knowing and Voluntary Plea***

Despite his protestations otherwise, Miller entered a knowing and voluntary plea. Only a knowing and voluntary plea "is constitutionally valid." *Bousley*, 523 U.S. at 618 (citation omitted).

---

[15] *See United States v. Mayhew*, 995 F.3d 171, 179–80 (4th Cir. 2021) ("[I]f a defendant alleges that he accepted a government plea offer based on the erroneous advice of counsel, but entered the plea only after the misadvice 'was corrected by the trial court at the Rule 11 hearing,' then he will not be able to show the necessary causal link between counsel's error and his decision to plead guilty.") (citation omitted).

"[A] plea of guilty entered by one fully aware of the direct consequences . . . is voluntary in a constitutional sense unless induced by" threats, misrepresentations, or improper promises. *Id.* (citation omitted). A defendant enters an intelligent (or knowing) plea when he "first receives 'real notice of the true nature of the charge against him.'" *Id.* (citation omitted). To ensure that a defendant enters a valid plea, courts frequently question defendants under oath pursuant to Federal Rule of Criminal Procedure 11. As discussed, Miller and the Court engaged in such questioning when he pleaded guilty.

This colloquy goes a long way in assuring the intelligence and voluntariness of the plea. Indeed, as explained above, courts must dismiss any § 2255 allegation "that contradicts a petitioner's sworn statements made during a Rule 11 plea colloquy." *United States v. Yelizarov*, 140 F.4th 597, 605 (4th Cir. 2025) (citations omitted). Accordingly, "a guilty plea generally limits collateral attacks to 'whether the plea was counseled or voluntary.'" *Merritt v. United States*, 499 F. Supp. 3d 249, 255 (E.D. Va. 2020) (quoting *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1295 (4th Cir. 1992)).

Miller's allegations today sound very different from his colloquy. Indeed, he now says he is innocent of all the crimes he admitted under oath. (ECF No. 94, at 30.) He also again complains that his lawyer failed to explain "the difference between 'receiving' a file" of child pornography "and being guilty of receipt by asking for a photo he knew was illegal." (*Id.*) Further, Miller believes that his wife, "acting as a paid agent of the U.S. government" in its conspiracy against him, induced his plea by falsely promising to reunite their fracturing family. (*Id.* at 32.)

His colloquy, however, contradicts each and every one of these claims. In his sworn responses, Miller admitted his guilt and agreed to a statement of facts detailing his criminal actions. (ECF No. 106, at 18–19.) Further, as explained above, Miller agreed the government could prove

the receipt charge, even after the Court properly explained the elements of the charge to him. (*Id.* at 35.) Any alleged failure of Townsend's, therefore, could not invalidate Miller's plea. *See Mayhew*, 995 F.3d at 179–80. Finally, Miller agreed that no one other than the government made promises to him concerning his guilty plea and that no one had threatened him or his family. (ECF No. 106, at 22–23.) This admission contradicts his assertion that his wife agreed to reunite their family to get him to plea.

Accordingly, the Court will deny Miller's 2255 motion to the extent it claims he involuntarily and unknowingly pleaded.

### *C. Actual Innocence*

Miller says he did not commit any of the crimes he pleaded to. To prevail on "a claim of actual innocence after a negotiated guilty plea," Miller "must show that he is factually innocent of the underlying criminal conduct." *United States v. Adams*, 814 F.3d 178, 184 (4th Cir. 2016). Courts should not grant actual innocence claims "casually," but must weigh "reliable evidence not presented" earlier in the case. *Wilson v. Greene*, 155 F.3d 396, 404–05 (4th Cir. 1998). The Court can grant an actual innocence claim when the new evidence, when viewed in light of the old, shows that no "rational trier of fact could [find] guilt beyond a reasonable doubt." *Hazel v. United States*, 303 F. Supp. 2d 753, 761 (E.D. Va. 2004) (citation omitted). Further, as with all collateral attacks under § 2255, absent "extraordinary circumstances," courts may dismiss those claims that "directly contradict the petitioner's sworn statements made during a . . . Rule 11 colloquy." *Lemaster*, 403 F.3d at 221–22.

Because Miller fails to offer new credible evidence and contradicts his earlier sworn statements, the Court will deny his actual innocence claims.

*1. Receipt of Child Pornography*

Miller says he did not commit the crime of receiving child pornography. In Miller's view, the government charged him with receipt because a teenaged girl sent him a photograph against his will.[16] Accordingly, in his motion, Miller offers their text messages which purportedly show his unwillingness to receive this photo.[17] Further, Miller attempts to explain away any other child pornography he received by claiming a now-deceased attorney had stored it on Miller's electronics as part of an unrelated case. Finally, Miller again claims to not have truly understood what "receipt" entailed when he pleaded guilty.

None of these allegations prove Miller's innocence. To begin, the government did not charge Miller for the picture allegedly sent by a teenaged girl. It filed a receipt charge because Miller had "still image and video files depicting minor and prepubescent children" engaging in sex, bestiality, masochistic abuse, and exhibition of their genitalia. Further, the parties stipulated that Miller received and possessed "more than 700 images or videos constituting child pornography," including one video of "a prepubescent female's vagina being penetrated by an adult erect[] penis." (ECF No. 31 ¶¶ 38, 40.)

Miller's actual innocence claim regarding the child pornography conviction, therefore, fails on at least two fronts. First, he presents no new "reliable evidence" that rebuts older evidence. *Wilson*, 155 F.3d at 404. The teenager's alleged messages cannot cast any doubt on the claim that

---

[16] (ECF No. 94, at 9.) Miller also believes this girl had close contacts with an FBI agent, who proceeded to "weaponize a corrupt system of justice against Miller" for his interaction with the girl. (*Id.* at 104.)

[17] (*Id.* at 10.) Miller never provides screenshots of these messages; rather, he reproduces them by hand. Although this could lead one to doubt the existence of these messages, the Court would still deny the motion even if these messages do exist.

Miller received and possessed other images *entirely unrelated* to the teenager. Second, Miller again contradicts his Rule 11 colloquy. At his plea hearing, Miller agreed to the truth of everything in the statement of facts—so he cannot now say he never received child pornography.[18] Nor can Miller pin his crimes on a dead man who nowhere appears in the agreed-to statement of facts. (*See generally* ECF Nos. 31, 106.) Finally, to the extent Miller did not understand what receipt entailed, the Court's colloquy cured his ignorance for reasons already explained. *See Mayhew*, 995 F.3d at 179–80.

Accordingly, the Court rejects Miller's claim of actual innocence on the receipt charge.

2. Financial Crimes

Miller also says that he never engaged in an unlawful monetary transaction or committed wire fraud. As for his money laundering, he claims to have properly submitted invoices for work done pursuant to a government subcontract. Again, he alleges the government "suppressed" evidence of his innocence during discovery to aid its vast conspiracy against him. (ECF No. 94, at 14.) In discussing wire fraud, he once more contends the government covered up evidence proving his innocence or ignored his good faith efforts to repay his Quora investors. (*Id.* at 19–20.) He also claims to have used investors' money to pursue millions in contracts, but outside forces thwarted these deals at every turn. (*Id.* at 21–22.)

As before, Miller's accusations directly oppose his sworn Rule 11 colloquy. Miller told the Court that he read the statement of facts which contained nothing but the truth. (ECF No. 106, at 18–19.) The statement of facts clearly describes his money laundering: He diverted work from a subcontract, failed to do the work, and then overbilled the prime contractor. (ECF No. 31 ¶¶ 15–29.) Further, the statement of facts describes his wire fraud: Miller promised Quora users a great

---

[18] (ECF No. 106, at 18–19); *see Lemaster*, 403 F.3d at 221–22.

return on investment, but he instead used their money for personal purposes. (*Id.* ¶¶ 4–14.) The contradiction between his current motion and his colloquy requires the Court to disregard Miller's financial crimes claims of innocence. *See Lemaster*, 403 F.3d at 221–22.

### *D. Prosecutorial Misconduct*

In his final ground, Miller expands on his claim that vast government conspiracies undermine the validity of his conviction. He raises several legal claims in response to this alleged criminal enterprise—for example, malicious prosecution; suppression of exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny; and prosecutorial misconduct in violation of due process. (ECF No. 94, at 84, 92, 99–100.) To accept Miller's allegations as true, however, the Court would need to discredit his Rule 11 colloquy. Because the law privileges Miller's sworn statements over his current allegations, the Court will deny relief on all of Miller's prosecutorial misconduct claims. *See Yelizarov*, 140 F.4th at 605.

Miller describes four fantastical and "overlapping conspiracies" against him, all involving a particular FBI agent. (ECF No. 94, at 83.) Apparently, this agent despised Miller because of his involvement with two friends of the agent's daughter. (*See id.* at 87–91.) Miller claims to have "dated" one friend, but to have rebuffed the romantic advances of the other, a minor teenager. (*Id.*) In retaliation, the agent began the various conspiracies: First, the agent allegedly destroyed or hid large amounts of evidence proving Miller's innocence. For example, he destroyed two iPhones which contained both a conversation in which the teenaged minor sent an erotic picture to Miller against his will and a video of the agent committing crimes. (*Id.* at 84–86.) Second, the agent supposedly helped the teenaged minor blackmail Miller. (*Id.* at 93.) Third, the agent purportedly agreed to help Miller's wife "steal" Miller's pension if she helped coerce Miller into pleading. (*Id.*

at 93–96.) Fourth, the agent allegedly pressured Miller to delete videos showing other FBI agents planning to defraud the government. (*Id.* at 96–99.)

Fundamentally, these allegations all begin with the premise that Miller did not commit the crimes he admitted to; instead, he believes that others conspired to misconstrue or hide evidence which would otherwise rescue him from conviction. But, as said already, Miller agreed that he was guilty of the crimes charged and that the statement of facts supporting his plea was true. (ECF No. 106, at 18–19.) He also agreed that he had no side deals with anyone that coerced him into pleading. (*Id.* at 22–23.) In other words, the very premise of each claim of prosecutorial conduct contradicts his Rule 11 colloquy. As such, his allegations are "'palpably incredible and 'patently frivolous or false.'" *Lemaster*, 403 F.3d at 221.

The Court, therefore, will deny his § 2255 motion in full. (ECF No. 86.)

## V. MISCELLANEOUS MOTIONS

After dealing with the merits of Miller's § 2255 claim, the Court can easily rule on the remaining motions in this matter. (ECF Nos. 91, 93, 114.)

In his motion for a restraining order and emergency injunctive relief, Miller asks the Court to stop "the distribution of funds" from his pension account to his wife, given her role in the alleged conspiracies against him. (ECF No. 91.) As the Court has already stated, Miller's allegations of conspiracy involving his wife are patently frivolous. *See supra* Part IV. Accordingly, the Court will not grant the motion.

Further, Miller has asked the Court to hold an evidentiary hearing in this matter and then notify the U.S. Attorney General so that he can appoint a special prosecutor to investigate Miller's charges. (ECF No. 93.) First, the Court will deny the request for an evidentiary hearing. When deciding § 2255 motions, courts either construe the defendant's claims as true, *United States v.*

*Nicholson*, 475 F.3d 241, 248 (4th Cir. 2007), or find that the motion "relies on allegations that contradict" the Rule 11 colloquy, *Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (citations omitted). Because the Court found contradictions in or assumed the truth of Miller's allegations as appropriate, a hearing would serve no purpose. Second, because the record contradicts Miller's claims of a conspiracy to put an innocent man in jail, the Court will deny his request to notify the Attorney General of his allegations. Finally, Miller claims that the government has obstructed his outgoing mail as a part of its continued conspiracy against him. (ECF No. 114.) Because these allegations are palpably incredible, the Court will deny this motion, too.

## VI. CONCLUSION

Miller's allegations do nothing to invalidate his conviction or sentence. Accordingly, the Court will deny his § 2255 motion. (ECF No. 86.) Although the Court will grant Miller's requests to supplement his filings, (ECF Nos. 111, 112), the Court will deny all other pending motions in this matter. (ECF Nos. 91, 92, 93, 102, 105, 114.) The Court also declines to issue a certificate of appealability ("COA").[19]

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 17 August 2026
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

[19] An appeal may not be taken from a final order in a § 2255 proceeding unless a judge issues a COA. 28 U.S.C. § 2253(c)(1)(B). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Miller has not met this standard.